UNITED STATES, Appellee

v

JOHN A. BAKER, Stewardsman, U. S. Navy, Appellant

11 USCMA 313, 29 CMR 129

No. 13,397

Decided March 11, 1960

*Commander John P. Gibbons* argued the cause for Appellant, Accused. *Lieutenant (jg) Eric L. Keisman* argued the cause for Appellee, United States.

## Opinion of the Court

GEORGE W. LATIMER, Judge:

The accused pleaded guilty to being absent without leave and not guilty of wrongfully using heroin, in contravention of Articles 86 and 134, Uniform Code of Military Justice, 10 USC §§ 886 and 934, respectively. He was, however, convicted of both offenses, and sentenced to be separated from the service with a bad-conduct discharge, to forfeit all pay and allowances, to be confined at hard labor for two years, and to be reduced to the grade of steward recruit. The findings were approved by the convening authority, but he reduced the confinement portion of the sentence to a period of nine months. The board of review affirmed the action of the convening authority, and thereafter we granted accused's petition for review to consider whether the law officer erred in overruling a defense objection to testimony of a medical officer allegedly barred by Article 31, Uniform Code of Military Justice, 10 USC § 831.

The accused was apprehended by agents of the Federal Bureau of Investigation in New York City on March 10, 1959, at the request of his father. The only reason for taking him into custody was that he was an unauthorized absentee from the United States Navy. He was taken to the United States Naval Receiving Station in Brooklyn and on the 12th day of March 1959, he was one of a group of approximately six prisoners who were given a routine physical examination by a medical officer. It would appear that the examination was given pursuant to regulations prescribing physicals for prisoners when admitted. In the course of examining him, the doctor noticed multiple venipuncture marks on the accused's arms which were in various stages of healing, some of them being recent. No treatment was given at that time, but two days thereafter the accused reported to the doctor complaining of being nervous and unable to sleep. The doctor prescribed the use of a tranquilizing drug to alleviate the condition.

The doctor was called as a witness

314

and, over objection of defense counsel, he testified that, in his opinion, accused had, sometime prior to his return to the station, given himself an intravenous medication of a narcotic type of drug. This opinion was admitted in evidence after the doctor had been examined and cross-examined on the foundation for his opinion. It appears from the doctor's testimony that when he first observed the needle marks, he could not determine the reason for their presence. He testified that venipuncture marks only indicated to him that either the accused had taken something into his veins or something had been taken out. The appearance and physical condition of the accused gave no clue to aid the doctor, and so he proceeded to obtain a clinical history from the accused. Apparently this history was obtained on March 12, 1959, although the record does not clearly reflect whether it was then or two days later on the 14th of March. That is of no consequence, however, for the doctor was not sufficiently convinced the accused was a user of habit-forming drugs to make any official entry of his opinion to this effect until the latter date. At that time the accused consulted with the doctor about his nervousness and inability to sleep, and then his disorder was diagnosed as being that of a narcotics user. During the course of his examinations and consultations, the doctor did not advise the accused of his rights to remain silent under Article 31 of the Code, supra.

There are two subsections of Article 31 which are relevant to our discussion, and they are the following:

"(b) No person subject to this chapter may interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial."

and:

"(d) No statement obtained from any person in violation of this article, or through the use of coercion, unlawful influence, or unlawful inducement may be received in evidence against him in a trial by court-martial."

As a preliminary matter, we dispose of the contention that the evidence was admitted in violation of ■ subsection (d) of the above-mentioned Article. Undoubtedly, in the course of his consultations some questions were asked by the doctor and some answers given by the accused, but they did not find their way into the record. The doctor did not testify as to any statement made by the accused and, so far as the court-martial was concerned, the subjects discussed were never revealed. Therefore, the issue which presently confronts us arises solely out of a possible violation of subsection (b), for the opinion of a doctor was, in part, based upon statements made by the patient.

This is the first occasion where we have been specifically required to pass on the point in issue. In United States v Bunting, 6 USCMA 170, 19 CMR 296, we were faced with a situation in which a medical examination was ordered to determine the mental responsibility of an accused. In that case, the author Judge of this opinion expressed the view that under certain conditions a medical expert comes within the proscription of Article 31, supra. The Chief Judge and Judge Brosman expressly reserved passing on that principle because, in their opinion, it was not covered by the certified question.

In considering the defense objection to the testimony, the law officer referred to the opinions in that case and to two board of review decisions, United States v Barnes, 13 CMR 553—a Navy case—and United States v Reed, 21 CMR 355 —a case arising in the Army. He concluded the Chief Judge and the author Judge were in disagreement and, because Judge Ferguson had not spoken, he was free to follow the Navy rule set out in *Barnes*. Regardless of his reasoning, he arrived at the correct result, for the dissimilarity in the facts here and those in *Bunting* leaves the case at bar untouched by our decision in that

instance. There the patient had been charged, *inter alia,* with the crime of unpremeditated murder. He was ordered by the convening authority to appear before a board of medical officers, and the purpose of his appearance was to permit the board to determine whether he was mentally responsible for his criminal acts. The accused was not only suspected of committing an offense, he was under charges, and the purpose of the inquiry, as noted, was to determine his responsibility for the offenses—an essential part of the prosecution's case against him. The Army and Air Force regulations governing the medical officers in those services directed their medical experts to advise an accused of his rights under Article 31 before proceeding with an insanity examination. Those differences are substantial and show the reasons why that case is not authority for the proposition that the testimony in this case is inadmissible.

In United States v Barnes, supra, a Navy board of review had before it a case substantially akin to the one at bar, although in that instance there was reason to suspect the accused of having used narcotics. There, as here, the doctor found needle marks over the veins of the accused's arm, and in the course of his examination obtained a clinical history. Based on the examination and the history furnished by the accused, the doctor formed the opinion that he was a user of narcotics. The board of review held that questioning a person in the course of a medical examination for the purpose of establishing the significance of physical symptoms which may otherwise be indeterminate is not a violation of Article 31.

In United States v Reed, supra, an Army board of review followed the view expressed by the author Judge in *Bunting,* supra, but the facts are not similar to those reflected by this record. In that instance, the accused was apprehended for suspected use of narcotics. He was examined that same night by a medical officer at an Army dispensary for the purpose of ascertaining the presence of narcotics in his system. The next morning he went on sick call and was examined by the same doctor.

During his second examination, the attending physican asked the accused whether or not he had been using narcotics. The accused replied that he had been a user for some six months. The question of the doctor and the answer by the accused were introduced in evidence over defense objection. The board of review held the testimony was inadmissible but went on to say it was not attempting to engraft the usual doctor-patient privilege upon the military service or implying that the medical officer could not express an opinion based on a physical examination of the accused. All the board held in that instance was that the incriminating statement made by the accused was inadmissible under Article 31(d). As previously suggested, that question is not before us.

In the instant case, it being reasonably inferable that the doctor's opinion was based on both a physical inspection and an interrogation of some type, it becomes necessary to determine whether he violated subsection (b) of Article 31, supra, by failing to warn the accused. We are certain he did not, and our reasons for that conclusion will show the point of departure from the previously decided cases. The doctor in the case at bar saw accused on both occasions for medical purposes—the first time for a routine preconfinement physical examination, and again two days later at sick call. When the doctor physically examined the accused, he did not suspect him of any offense within the meaning of the subsection. Of course, it would be ridiculous to contend that the medical expert was not put on notice that the accused was restrained for having committed some offense. He was in the brig for misbehavior of some sort, but it was for unauthorized absence and not for trafficking in habit-forming drugs. The defense produced evidence to show that when apprehended there were no outward manifestations that the accused was under the influence of narcotics and the same condition existed at the time he was first observed by the doctor. The needle marks were obvious, but the doctor testified they were neutral insofar as he was con-

**316**

cerned. According to him, they indicated one of two possibilities, either the extraction of bodily fluids from the accused or injection of liquids into his body intravenously. It would be grossly negligent for the doctor not to resolve the doubt and ascertain from the accused the true cause, and it is clear from this record that whatever history he obtained was not elicited for the purpose of obtaining facts to help perfect a criminal case against the accused; it was needed to determine the necessity for and the nature of a course of treatment, and to make an appropriate assignment of the accused. At the time of the first inquiry, the doctor was not possessed of sufficient information to notify the accused he was suspected of a narcotics offense and to state the nature of the accusation. All he had was evidence which required him to inquire about accused's true physical condition. Several reasons impelled him to make this inquiry, and they are foreign to any thought of criminal prosecution. We need only mention segregation of prisoners and treatment of individuals who might be suffering from a malady requiring intravenous injections. But, assuming the doctor concluded the use of narcotics was a distinct possibility, he was duty bound to ascertain the facts for protective measures and curative purposes, and if that was his aim his questioning was proper and not in contravention of the Article.

In construing this statute, we must give consideration to the purposes intended by Congress and a construction should not be favored which would seriously impair the efficiency of the medical service. There are just too many impossible and absurd situations which would arise if we were to interpret Article 31 to bar inquiry of a patient by a medical officer when made in the course of his duties of treating individuals. An interpretation of that sweeping consequence would stifle proper diagnosis and prevent adequate care. To deny officers of the medical service the right to obtain information from military personnel which would aid in the prevention, control, and elimination of sickness and disease merely because some suspicion was aroused by outward appearances would render ineffectual much of the valuable service which is being rendered by that department. We are certain that Congress, when it was considering Article 31, did not intend to restrict medical officers in acquiring information which is essential for diagnostic, prophylactic, or remedial purposes. It did not expect that they be allowed to ferret out facts for prosecution purposes in true detective style, but it must have intended to permit them to continue to function as doctors and if that is their primary purpose in the acquisition of medical data, then they should be unhampered in their search for the truth. We are, therefore, of the opinion that Article 31(b), supra, does not apply to a medical officer when he is obtaining information regularly required in the performance of his duties in treating patients.

Some argument has been suggested to the effect that it is perfectly proper for the medical expert to interrogate, so long as the information he obtains is not used directly or indirectly in a subsequent criminal prosecution. A rule to that effect would not only becloud official medical records, but it would be inconsistent with the plain wording of Article 31(b). Under this subsection, Congress has issued a mandate that a person subject to the Code shall not interrogate a person suspected of an offense without giving him the prescribed warning. If there is any suspicion on the part of the doctor, the very act of interrogating without giving the advice would be illegal, and would render the medical expert subject to prosecution under Article 98(2) of the Code, 10 USC § 898. We hardly envision Congress intending to subject medical officers to criminal sanctions for obtaining information which is necessitated by the demands of professional proficiency.

For all of the foregoing reasons, it is our considered judgment that opinions of doctors, based on a combination of physical examinations augmented by information furnished by members of the armed forces not being interrogated for self-incriminatory purposes, are not barred by Article 31.

The decision of the board of review is affirmed.

Chief Judge QUINN concurs.

FERGUSON, Judge (dissenting):

I dissent.

It is with regret that I part from my brothers on their interpretation of the record of trial before us, but I am convinced that a fair reading of the transcript of testimony establishes that the medical officer involved suspected the accused of using narcotics and initiated the series of events which eventually led to his conviction.

Tried by general court-martial, the accused pleaded guilty to a charge of absence without leave, in violation of Uniform Code of Military Justice, Article 86, 10 USC § 886, and not guilty to the offense of using a habit-forming drug, in violation of Code, supra, Article 134, 10 USC § 934. He was found guilty of both delicts and sentenced to bad-conduct discharge, forfeiture of all pay and allowances, confinement at hard labor for two years, and reduction to steward recruit. With some reduction in the portion of the sentence adjudging confinement, intermediate appellate authorities affirmed, and we granted accused's petition on the issue whether it was proper to receive evidence relating to a medical officer's opinion that accused was a narcotics addict.

Accused was apprehended by civilian authorities as an unauthorized absentee on March 10, 1959. He was delivered into the custody of naval personnel, and on March 12, 1959, was required to undergo a routine preconfinement physical examination at the U. S. Naval Receiving Station brig. The examination was conducted by Lieutenant Gerald W. Buetow, Medical Corps, United States Naval Reserve, a naval officer on active duty. Dr. Buetow noticed vein punctures on accused's arms. His own testimony best reflects the suspicion which these marks aroused:

"Q. You have testified that it was your opinion that due to the physical factors you observed on the accused and his past history, that he had used

318

some type of narcotic drug; is that correct?

"A. Yes.

"Q. When did you first make this determination?

"A. I don't understand what you mean?

"Q. Did you make this determination after your examination on the 12th or after he presented himself to you on the 14th?

"A. I reached a conclusion in my own mind—an opinion, not a diagnosis; an opinion on the 12th.

"Q. Can you explain why you made no record of such opinion?

"A. Well, I don't think it's—to put an entry in a health record—to put a diagnosis—to pin a label or a diagnosis on a man; a patient that presents himself to me, I think that I would require further investigation or, let's just say not investigation—I would have to wait and observe characteristic physical findings in the clinical course of a patient *before making a conclusive diagnosis.*

. . . .

"Q. Now, Doctor, is it your statement that as of the 12th of March, you were not sufficiently convinced of the accused's physical state as to make *any diagnosis,* one way or another?

"A. That's right.

. . . . .

"Q. After your opinion that this man had used narcotics, did you report this to anyone?

"A. Yes, I did.

"Q. To Whom, may I ask?

"A. *To my immediate superior, Captain Humphries.*

"Q. When was that?

"A. I believe it was the same day. I'm immediately responsible—yes, I'm immediately responsible to Captain Humphries, therefore, any problems

—

"Q. He's your division officer?

"A. He's my commanding officer, as far as the medical department is concerned. . . .

. . . . .

"Q. Excuse me. I misunderstood your testimony.

"A. *12th of March was the day that*

*I spoke to Captain Humphries about the case.*

"Q. Can you recall the next time anybody ever said anything about this problem?

"A. I believe the next time was on the 14th after placing the patient on medication, I discussed the case once again with Captain Humphries." [Emphasis supplied.]

Doctor Buetow indicated that the venipunctures were medically neutral to him. However, on an undisclosed date, he obtained a clinical history from the accused which caused him to conclude that the punctures resulted from the injection of narcotic drugs. At no time prior to obtaining the history did he advise the accused of his rights under Code, supra, Article 31, 10 USC § 831. On March 14, 1959, accused complained that he was nervous and unable to sleep. Dr. Buetow prescribed tranquilizing drugs and noted in accused's Health Record that he had a history of mild drug addiction. Over defense objection, Dr. Buetow was permitted to testify to the following matter:

"A. The opinion that I formed was that the physical findings of venipuncture marks represented, in my mind, the findings of having given himself intravenous medication, *which from the patient's history, led me to believe it was a narcotic type drug.*" [Emphasis supplied.]

Code, supra, Article 31, provides that, "No person subject to this chapter may interrogate, or request any statement from, an accused or *a person suspected of an offense*" unless he is given the warning for which provision is made in that statute. (Emphasis supplied.) My brothers have so construed Article 31 that the additional requirement of "officiality" must be met before its warning requirement comes into play. United States v Dandaneau, 5 USCMA 462, 18 CMR 86; United States v Gibson, 3 USCMA 746, 14 CMR 164; concurring opinions of Judge Latimer and Chief Judge Quinn, United States v Souder, 11 USCMA 59, 28 CMR 283. Accepting the validity of that concept, however, for the purposes of this case, I am nevertheless unable to perceive the rationale by which it is finally determined that interrogations conducted by armed services medical officers are not within the Article's coverage.

At the outset, I note the record makes it crystal clear that Doctor Buetow suspected the accused of injecting narcotics into his veins at the time he examined him on March 12. True it is he acted with praiseworthy caution in refraining from entering any notes in accused's records until he was assured of their accuracy by accused's later symptoms and clinical history. However, we have not required that a questioner be absolutely certain of a suspect's guilt before the warning is required. Code, supra, Article 31, requires only that suspicion be present, and this certainly need not reach the level of a medical diagnosis—a term requiring, in the doctor's words, that "I was able to say without a doubt that this man is labeled with any particular disease or problem."

It is equally apparent that Dr. Buetow acted in an official capacity when he sought to obtain information from the accused concerning the needle punctures. A medical officer in the armed forces owes a duty to the service of which he is a member as well as to his patient. With respect to the latter, he need only treat his ailments and insure the continuation of his good health. With respect to the former, however, he must make certain that the condition of no individual is permitted to affect the welfare and safety of the service as a whole. Thus, in the instant case, preconfinement physical examinations were in order, not only to establish that particular persons were able to undergo the rigors of confinement, but also to discover any affliction which would affect other personnel in the brig. In short, Dr. Buetow was in the performance of his official duties at the time he interrogated the accused and his purpose was to seek confirmation of his "opinion on the 12th" that accused was an addict. "Officiality," the consideration found to be material in my brothers' construction of Code, supra, Article 31, is here much more strongly established than in the case of the officer who sought to question suspects while

acting as the proprietor of a music store. United States v Souder, supra. Moreover, the record demonstrates that Buetow, acting as a naval officer, reported his suspicions to his superiors, and supports the inference that they, in turn, eventually caused appropriate criminal proceedings to be commenced.

As Dr. Buetow suspected the accused, and was acting within the scope of his official duties, it is apparent he was required to advise Baker of his rights under Code, supra, Article 31, unless it is simply to be held that no medical officer must comply with the statute in question. The author of the principal opinion, however, seeks to base the unavailability of this great shield upon the conclusion that the accused was not suspected of an offense, not under charges, and that the purpose of the inquiry was not to establish accused's guilt. I have already recorded my disagreement with these findings, as I believe the testimony of Dr. Buetow establishes that he suspected the accused and that his findings formed the basis for the charges. If indeed his inquiries were made solely for medical purposes, it is odd that he absolutely refused initially to designate accused as an addict but rather chose to report the matter to his commanding officer, who apparently passed the information to the line officer in charge of the naval station. It is equally certain that his findings form an essential part of the prosecution's evidence, for, lacking Dr. Buetow's testimony, there is no corpus delicti for accused's subsequent statement.

The second argument made in the principal opinion is that adherence to the warning requirement in the case of physicians would seriously impair the efficiency of the armed forces' medical service. I suggest that this sweeping statement is simply inapplicable under the circumstances of this case. Initially, a medical officer must suspect that an accused has committed an offense before the Article comes into play. In the majority of cases, that suspicion will not arise. Most doctors are concerned simply with the diagnosis and treatment of illness. Hence, they have no reason to believe that a person has violated the provisions of the Code. Accordingly, no warning need normally be interposed prior to obtaining an individual's clinical history. Compare United States v Hopkins, 7 USCMA 519, 22 CMR 309. Secondly, the addressing of a warning to the accused permits him to make a meaningful choice concerning whether he should disclose incriminating information to a physician which can result, as in this case, in the imposition of severe punishment. Finally, we should recognize the fact that the armed services deny the existence of a physician-patient privilege. Manual for Courts-Martial, United States, 1951, paragraph 151c(2). Certainly, Congress did not intend to strip an accused of every protection available to him simply because he is being questioned by a medical officer. To the contrary, I find the terms of Article 31 expressly applicable to every person "subject to this chapter." I am, therefore, compelled to conclude that a medical officer, suspecting an accused of the use of narcotic drugs, must advise him of his rights before attempting to obtain a clinical history which is subsequently to be used in evidence against him.

In the present case, the record demonstrates that Dr. Buetow was permitted to state a conclusion concerning accused's addiction, based upon the history which he obtained without the requisite warning. Moreover, contrary to Judge Latimer's assertion, he effectively related that history to the court, for he was permitted to testify, over appropriate objection, that accused had "given himself intravenous medication, which *from the patient's history, led me to believe that it was a narcotic type drug*." (Emphasis supplied.) As he suspected accused was an addict from the presence of needle punctures, I am of the view that he was required to give the necessary advice under Code, supra, Article 31. As he did not, I believe that reversal is required.

I would reverse the decision of the board of review concerning the narcotics conviction and return the record of trial for a rehearing on the sentence with respect to the findings of guilty of absence without leave.