**UNITED STATES**

v.

**Airman John G. LOUKAS, FR 573–45–2914, United States Air Force.**

**ACM 26543 (recon).**

U.S. Air Force Court of Military Review.

Sentence Adjudged 6 Aug. 1987.

Decided 16 March 1989.

Appellate Counsel for the Appellant: Colonel Leo L. Sergi; Colonel Richard F. O'Hair; Major William J. Reichart and Captain Paul M. Dankovich.

Appellate Counsel for the U.S.: Colonel Joe R. Lamport; Lieutenant Colonel Robert E. Giovagnoni; Lieutenant Colonel Morris A. Tanner, Jr. and Major Terry M. Petrie.

Before HODGSON, HOLTE, FORAY, MICHALSKI, LEWIS, BLOMMERS, KASTL, MURDOCK and PRATT, Appellate Military Judges, En Banc.

### DECISION UPON RECONSIDERATION

LEWIS, Senior Judge:

At the suggestion of appellate government counsel we have reconsidered *en banc* the prior Panel decision in this case. *United States v. Loukas,* 27 M.J. 788 (A.F. C.M.R.1988). Therein, the Panel concluded that the military judge erred in denying motions to suppress two separate inculpatory pretrial statements by the appellant and the results of a urinalysis. These errors were found to be prejudicial. The findings of guilty (incapacitation for duty through prior wrongful indulgence in drugs and wrongful use of cocaine) and sentence were set aside and a rehearing was authorized. Appellate government counsel have specifically asked that we reconsider that portion of the decision relating to the appellant's pretrial admission of cocaine use to Staff Sergeant (SSgt) Dryer. Having done so, we adhere to the earlier disposition.

To restate the pertinent facts briefly, the appellant was the loadmaster aboard a C-130 flight bound for Trinidad, Bolivia, where it was to receive certain unspecified cargo. The assistant crew chief, who was alone in the empty cargo section with the appellant at one point in the flight, noticed that the latter was acting in a decidedly irrational manner, pointing and calling out to invisible persons. The appellant handed the assistant crew chief his sidearm, a .38 calibre pistol, while urging that he take it. The assistant crew chief did so and reported the incident to his immediate superior, the aforementioned SSgt Dryer. SSgt Dryer confronted the appellant and observed that he was continuing to hallucinate. This behavior and the appellant's general appearance, caused SSgt Dryer to suspect that the appellant was under the influence of a drug. He was concerned for the security of the aircraft and its crew. Accordingly, he asked whether the appellant had taken drugs. The appellant responded that he had not. SSgt Dryer asked in a more insistent tone what the appellant had taken, or words to that effect. The appellant, in reply, acknowledged that he had used cocaine the evening before.

■ The Panel concluded that this oral admission of cocaine use should have been suppressed because the appellant had not been provided an Article 31, UCMJ, 10 U.S. C. § 831, rights warning by SSgt Dryer. This conclusion was based upon the two-pronged test for rights advisements enunciated in *United States v. Duga*, 10 M.J. 206, 210 (C.M.A.1981). The Panel, in so concluding, declined to apply the public safety exception recognized in *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). Having examined this issue *en banc*, we agree.

■ We certainly do not fault SSgt Dryer's actions. There can be no question that he acted properly and reasonably in querying the appellant concerning suspected drug use. He would have been derelict not to have done so. We are not surprised that he did not attempt to preface his inquiry with a rights advisement under the circumstances of this case. However, our conclusion that SSgt Dryer acted properly and reasonably does not, in and of itself, resolve the legal issue of admissibility. The *Duga* test recognizes that any military suspect has important rights that are not easily superceded by the claim of an overriding public interest. We can only repeat Judge Cook's observation that certain essential communications between a superior and his subordinate may occur which cannot subsequently be used against the subordinate in a trial by court-martial. *See United States v. Lewis*, 12 M.J. 205, 207 (C.M.A.1982).

Appellate government counsel urge us to find that SSgt Dryer was confronted by an inherently dangerous situation and that the incriminatory response he elicited from the appellant was within the scope of the public safety exception. They advance a compelling argument in support of this position. Although a substantial number of us agree that the public safety exception, or some form of it, is viable under military law, we have concluded that the record in this case does not present an appropriate factual situation for its application, nor for an exploration of its parameters.

■ However, based on our review of this record, we believe there is a lesson that may be drawn for the benefit of military judges who are asked to consider applying a form of the public safety exception in future cases. The military judge should insist that the government carry the burden of establishing: (1) that a significant safety concern or other exigency was perceived and (2) that it was this concern or exigency which prompted queries eliciting incriminating responses. The military judge should not attempt to rely upon whatever expertise he possesses, or believes he possesses, in assessing the peril of a given situation. *See generally, United States v. Conley*, 4 M.J. 327 (C.M.A. 1978).

For the reasons stated, we shall not disturb the previous Panel disposition of this case.

Senior Judge FORAY and Judges MICHALSKI, BLOMMERS and PRATT concur.

Senior Judge KASTL (concurring):

My dissenting brothers suggest that an operational exigency exception to the Fifth Amendment modelled on the public safety exception might be "attractive" or "reasonable" in future cases. I strongly disagree.

What makes the so-called operational necessity exception so mischievous is the bedrock on which it rests; in plain words, the key to the proposed exception is the assumption that *when the situation is truly serious, Constitutional protections are suspended.* Yet as Justice Sutherland said in *Home Building & Loan Association v. Blaisdell*, 290 U.S. 398, 483, 54 S.Ct. 231, 256, 78 L.Ed. 413 (1934), if the provisions of the Constitution be not upheld when they pinch as well as when they comfort, they may as well be abandoned.

Were we to uphold a "wheels up" Air Force operational exigency exception, could it not validly be argued that there should be a "submarine under the polar ice cap" or an "82d Airborne" or a "Coast Guard fighting drugs" exception? Where should one draw the line? Furthermore, it appears incongruous to embrace such a doctrine in peacetime when no such exception to the Constitution was needed in Viet Nam or Korea. *See United States v. Jones*, 26 M.J. 353, 356 (C.M.A.1988)

The parameters of the public safety exception outlined in *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984) are extremely narrow. There are more than 75 reported cases which address the exception. As I understand them, they deal with very, very limited situations where police officers are concerned for their own safety or that of others and the suspect has a gun or knife or supposedly possesses a bomb. *See* the cases gathered at Annot., 81 L.Ed.2d 990 (1988). The tightly-drawn exception expressed in those cases clearly does not cover this accused,

who was disarmed and in a situation where no one who testified perceived that he posed any threat:

> Q. Were you afraid when you went to talk to [the accused] to ask these questions—that he was going to grab a chain or any other article in that aircraft?
>
> A. (SSgt Dryer) No, sir.
>
> * * * * * *
>
> Q. Were you afraid at any time that he was going to attack or grab any article on the aircraft?
>
> A. No, sir.
>
> Q. Was the flight of that aircraft or the airplane itself at any time during this flight in danger because of the accused?
>
> A. No, sir.

In a Constitutional system, military commanders who act responsibly may not see the results of their labors admissible in a court-martial. Nonetheless, a military member may have rights which are not easily overtaken by a claim of some overreaching public interest or operational necessity. *See Jones, supra,* at 357, quoting Justice Marshall in *New York v. Quarles, supra.*

Ultimately, it is the arbitrariness of any operational necessity exception which disturbs me. That proposed exception and the rule of the Constitution cannot coexist, I believe. They are incompatible and antagonistic forces; when brought into conflict, one or the other must necessarily wither.

Chief Judge HODGSON with whom Judge HOLTE joins (dissenting):

A *Miranda/Tempia* * and Article 31, UCMJ warning is not required every time one military member questions another. The purpose of the questioning and the function of the questioner must be considered in determining whether the request for a statement is within the purview of Article 31.

Thus, a casual conversation between two service members which results in an incriminating statement triggers no warning requirement if the questioning had a per-

---

* *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and *United States v. Tem-* *pia,* 16 U.S.C.M.A. 629, 37 C.M.R. 249 (1967).

sonal rather than an official motivation. *United States v. Duga,* 10 M.J. 206 (C.M.A. 1981).

In *United States v. Henry,* 21 U.S.C.M. A. 98, 44 C.M.R. 152 (1971), the Court of Military Appeals concluded that an Army officer who heard shots within a compound in Vietnam, ran to investigate, and upon seeing 8–10 persons near a hut, asked, "Who shot who?," was not required to give a codal warning and advice as to the right to counsel to an accused who responded, "I shot him." The Court observed that the conclusion as to criminality or suspicion in a particular case depends on the totality of the surrounding circumstances.

No one argues that questioning for the purposes of medical diagnosis must be preceded by the warning of rights. Indeed, the Court of Military Appeals stated in *United States v. Fisher,* 21 U.S.C.M.A. 223, 44 C.M.R. 277 (1972):

> A medical doctor who questions an individual solely to obtain information upon which to predicate a diagnosis, so that he can prescribe appropriate medical treatment or care for the individual, is not performing an investigative or disciplinary function; neither is he engaged in perfecting a criminal case against the individual. His questioning of the accused is not, therefore, within the reach of Article 31.

Although the appellant's questioner, Staff Sergeant Dryer, is not a physician there is no doubt he was concerned about the appellant's well being.

Let us briefly consider the facts. The appellant is a loadmaster on a C–130 aircraft flying to South America over generally uninhabited jungle. Staff Sergeant Dryer, the crew chief, is told the appellant is acting in an "irrational manner, pointing and calling out to invisible persons." He is apparently suffering from hallucinations. The appellant is unarmed, having previously surrendered his weapon to the assistant crew chief. Dryer is concerned for the security of the aircraft and the safety of the crew, and asks the appellant if he is on drugs. The appellant says no, but after further questioning by Dryer admits he had used cocaine the night before. It is this statement and the results of a later urinalysis that the majority holds were improperly admitted.

The majority opinion acknowledges that a public safety exception as enunciated in *New York v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), or some form of it is viable under military law, but declines to invoke it under the facts here. I also will not delve into a lengthy discussion of the public safety exception although the discovery of a spaced out crew member aboard an aircraft flying over a jungle might lead one to conclude that the questioning was reasonably prompted by a concern for the health of the appellant, the safety of the aircraft, and the crew's ability to complete the mission, rather than the desire to perfect a criminal case against him.

An operational exigency exception modelled after the public safety doctrine set out in *New York v. Quarles* is an attractive solution and a reasonable compromise to the situation at hand. Such an exception would protect both the rights of the individual and society at large. However, my affirmance of the appellant's conviction is not bottomed on such an exception, but rather on my conclusion that Dryer was not required under the factual scenario before us to give the appellant a threshold warning prior to questioning him about drug abuse. Dryer's questioning of the appellant was not designed to uncover criminal behavior, but was a good faith effort to provide immediate first aid to someone who clearly needed medical attention. Knowing what was the cause of the appellant's bizzare behavior was a vital bit of information. The trial judge correctly admitted the appellant's statement confirming this to be so. *Cf. United States v. Muniz,* 23 M.J. 201 (C.M.A.1987) (Search of appellant's desk drawer reasonable under the emergency exception to the Fourth Amendment).

Judge MURDOCK (dissenting):

The more I study this case, the more I am convinced that the statements about

cocaine use the appellant made to SSgt Dryer were admissible. When something new happens in the law, whether is it a new statute or a new interpretation of an old one, attorneys and courts frequently wobble for a while until a generally accepted view of the new principle emerges. The public safety exception of *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984) and the inevitable discovery exception of *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) have proved to be almost irresistibly tempting for prosecutors and have both produced quite a few "wobble" cases.

I see no reason to further the confusion about public safety or inevitable discovery by using either doctrine to uphold SSgt Dryer's statements. Instead, I see this as a proper case in which to focus on an emergency exception, which I will call a "first-aid" exception. This differs absolutely from the public safety exception in that the focus of public safety is outward—the safety of others. The focus of the first-aid exception I propose is inward—the immediate welfare of the person who later becomes an accused.

Courts have routinely applied a first-aid exception to Fourth Amendment search and seizure questions. The Supreme Court discussed this in *Mincey v. Arizona*, 437 U.S. 385, 392, 98 S.Ct. 2408, 2413, 57 L.Ed. 2d 290 (1978) when they said:

> Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid. . . . "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Wayne v. United States*, 115 U.S.App.D.C. 234, 241, 318 F.2d 205, 212 (opinion of Burger, J.). . . .
>
> But a warrantless search must be "strictly circumscribed by the exigencies which justify its initiation," *Terry v.*

> *Ohio*, 392 U.S. [1] at 25–26 [88 S.Ct. 1868 at 1882, 20 L.Ed.2d 889 (1968) ].

437 U.S. at 392–393, 98 S.Ct. at 2413–2414.

In *State v. Loewen*, 97 Wash.2d 562, 647 P.2d 489 (1982), the Washington Supreme Court, sitting en banc, faced the medical exception in a case where the accused was found dazed at an accident site. She was conscious, but unable to identify herself or tell what had happened. Her young child was in the car and was also unable to provide any clue as to identity or what had happened. In an attempt to identify the dazed woman, the security guard who had found her looked in a wallet he found on the front floor of the car. He did not find a driver's license or photograph, but did find a concealed weapons permit issued to Karen Loewen. The guard notified the police, and they found that the car was registered to another name.

Eventually, the police decided to take Loewen to the hospital. In the course of preparing her for the ride, he placed the wallet "right on top" inside her tote bag. The policeman also discovered drug paraphernalia in the jeans she was wearing. Once at the hospital the policeman reopened the tote bag in an effort to "get a positive identification". While he was looking through the bag, he found three baggies of drugs. Loewen was later brought to trial for the drug offenses and the trial court denied the motion to suppress the drugs and the paraphernalia. The Washington Supreme Court reversed, holding that "in order to come within the medical emergency exception, however, we must be satisfied both subjectively and objectively that the search was actually motivated by a perceived need to render aid or assistance." The Court then discussed a two part test to determine this motivation, citing *State v. Prober*, 98 Wis.2d 345, 297 N.W.2d 1 (1980):

> First, the search is invalid unless the searching officer is actually motivated by a perceived need to render aid or assistance. Second, even though the requisite motivation is found to exist, until it can be found that a reasonable person under

the circumstances would have thought an emergency existed, the search is invalid. *Loewen,* 647 P.2d at 493.

The military equivalent of this medical exception is found in Military Rule of Evidence 314(i). This rule, titled "Emergency searches to save life or for related purposes", states:

> In emergency circumstances to save life or for a related purpose, a search may be conducted of persons or property in a good faith effort to render immediate medical aid, to obtain information that will assist in the rendering of such aid, or to prevent immediate or ongoing personal injury.

Medical emergencies by their very nature call for immediate action. State, federal, and military jurisdictions have recognized that medical emergencies of a future accused can provide a proper ground for a search which would otherwise be illegal.

The question we face in this case is whether there is a similar exception, under the Fifth Amendment and Article 31, UCMJ for what a future accused might say in response to medically imperative questions. In my view, this question has already been partially answered.

The first step in the analysis has to be whether Article 31 must be read literally. This question enjoyed some life earlier, but now appears to have been decided in favor of a flexible interpretation. The Court of Military Appeals noted this in *United States v. Fisher,* 21 U.S.C.M.A. 223, 44 C.M.R. 277 (1972) when they said:

> As applied to the interrogation of a suspect by a criminal investigator, the language of Article 31 is "plain and unequivocal." *United States v. Wilson,* [2 U.S.C.M.A. 248], 255, [8 C.M.R. 48 (1953)]. Applied to other kinds of questioning, however, the literal language is revealed as questionable.... It was, therefore, apparent early in the operation of the Uniform Code that not every interrogation or request for a statement is subject to the preliminary warning requirement of Article 31.

*Fisher,* 44 C.M.R. at 278. This flexible approach to Article 31 was reaffirmed in *United States v. Duga,* 10 M.J. 206 (C.M.A. 1981).

Where the victim requiring medical assistance is not the future accused, the developing case law indicates that warnings are not always required. Where the "interrogation of a suspect is undertaken by the police for the paramount reason that information is being sought to save a life, the interrogating officers are justified in 'not impeding their rescue efforts by informing defendant of his rights to remain silent and to the assistance of counsel' ". *People v. Willis,* 104 Cal.App.3d 433, 163 Cal.Rptr. 718, 726 (1980), *cert. denied,* 449 U.S. 877, 101 S.Ct. 222, 66 L.Ed.2d 99 (1980) in *United States v. Jones,* 19 M.J. 961 (A.C.M.R. 1985), *aff'd* 26 M.J. 353 (C.M.A.1988). *See also United States v. Anderson,* 21 M.J. 751 (N.M.C.M.R.1985).

The principal difference between these cases and the case at hand is that in the prior cases the person requiring medical attention has been a third party—not the future accused. In the present case, the appellant was the one who required attention. His fellow crew members noticed he was acting strangely. There was no obvious explanation for his behavior. For example, he was not in an unpressurized part of the airplane where he might be suffering from a lack of oxygen. Also, there was no evidence of any intoxicating materials around him. For example, no one saw liquor bottles or drug paraphernalia near him. All the crew members saw was another crew member who was acting strange. The crew was flying over South America, and had spent at least the night before the flight in Panama. The crew members knew the appellant had not restricted himself to the base the night before, and could assume that he had not limited his eating to meals prepared in the United States. Before SSgt Dryer began to talk to the appellant, a number of legal explanations could have existed for the appellant's behavior. Perhaps he was suffering from a hangover or food poisoning. Perhaps he was apprehensive about flying an American plane into the jungles and high mountains of South America. The

point to me is there was an ambiguous situation, a crew member was suffering, and SSgt Dryer was correct in attempting to find out what was causing the appellant's problem.

I see two possible analyses of this situation. No matter which of them is chosen, the statement to Dryer should be admissible.

The first analysis, and the one I favor, is that no warnings were required because the questioning was done to determine whether there was a medical problem, and if there was how to alleviate it. This basic principle has been recognized in our courts for years. It was most solidly announced in *United States v. Fisher*, 21 U.S.C.M.A. 223, 44 C.M.R. 277 (1972). The Court said:

A medical doctor who questions an individual solely to obtain information upon which to predicate a diagnosis, so that he can prescribe appropriate medical treatment or care for the individual, is not performing an investigative or disciplinary function; neither is he engaged in perfecting a criminal case against the individual. His questioning of the accused is not, therefore, within the reach of Article 31. We so held in *United States v. Baker*, 11 U.S.C.M.A. 313, 29 C.M.R. 129 (1960) and *United States v. Malumphy*, 12 U.S.C.M.A. 639, 31 C.M.R. 225 (1962).

44 C.M.R. at 279

The Court continued their analysis by saying:

*Baker* and the first *Malumphy* decision dealt with the complete inapplicability of Article 31 to the particular kind of questioning to which the accused in those cases were subjected. Since the questions asked the accused by the doctor in this case were solely for medical diagnosis and treatment, the threshold advice prescribed by Article 31 was not required, and the accused's answers were admissible.

44 C.M.R. at 279

The medical exception was acknowledged by the Army Court of Military Review in *United States v. Hill*, 13 M.J. 882 (A.C.M. R.1982). *Hill* was a case involving admissi-

bility of hearsay statements made by a mother to her injured son's physician. Although the Court ultimately held that the statements concerned had been "too closely connected with the criminal investigation to convince them that the questions were 'solely for medical purposes' ", they cited *United States v. Fisher* as standing for a medical exception to the requirement for Article 31 warnings:

We recognize that Article 31 rights are not required of medical doctors and related personnel who question an individual solely to obtain information upon which to predicate a medical diagnosis or to render treatment. *United States v. Fisher*, [citation omitted]. Furthermore, the questioning may concern an individual's mental health as well as his physical health. *United States v. Malumphy*, [citation omitted].

*United States v. Hill*, 13 M.J. at 882.

In 1985, the Army Court had an opportunity to discuss the medical exception again. In *United States v. Jones*, 19 M.J. 961 (A.C.M.R.1985), *aff'd* 26 M.J. 353 (C.M.A. 1988), the statements related to a third party victim and were relayed by a military policeman to a medical corpsman by telephone. In essence, the corpsman told the policeman what to ask in order to decide how to respond to the emergency. The Court found that "[t]he questions [the policeman] relayed from the corpsman at the dispensary to appellant were the only available means of obtaining information necessary for the provision of adequate medical services to a seriously injured person." As such, the Court held that the appellant's responses "were admissible and did not taint any subsequent evidence." 19 M.J. at 968.

In *Jones* a non-medical person relayed information to and from a medical technician in order to facilitate medical treatment of a third party. In *Fisher* a medical doctor questioned a future accused about his cocaine use. It is a small step indeed to find that the responses of a future accused to questions posed by a non-medical person are admissible where the questions are asked solely as a means of rendering emer-

gency medical aid. The Court of Military Appeals has even said that

> assuming the doctor concluded the use of narcotics was a distinct possibility, he was duty bound to ascertain the facts for protective measures and curative purposes, and if that was his aim his questioning was proper and not in contravention of the Article.

*United States v. Baker,* 11 U.S.C.M.A. 313, 29 C.M.R. 129 (1960).

I would hold that Article 31 did not apply to SSgt Dryer's questioning of the appellant because the questions were primarily to determine what was wrong with the appellant and whether medical intervention was necessary.

The other argument which might be advanced for holding this type of questioning to be admissible is that Article 31 does not apply because SSgt Dryer was not acting in an official capacity and that the appellant perceived the questions as nothing more than a casual inquiry. *See United States v. Duga,* 10 M.J. 206 (C.M.A.1981). Like the Army Court, I believe such an argument would be "artificial". *United States v. Jones,* 19 M.J. 961 (A.C.M.R.1985) *aff'd* 26 M.J. 353 (C.M.A.1988). In my view, SSgt Dryer was acting in an official capacity and was certainly in a position to trigger the "subtle pressure on a suspect to respond to an inquiry". *Duga,* 10 M.J. at 210, citing *United States v. Gibson,* 3 U.S.C.M.A. 746, 14 C.M.R. 164 (1954). It is only the application of the medical emergency exception which I urge that saves the statements from being excluded.

Having found that the statements to SSgt Dryer were admissible, I would hold there was sufficient evidence of the charged offenses and affirm. Because the appellant's admissions were complete, and they were spoken before the other contested statements or the urinalysis, I would affirm even if further analysis, which is unnecessary here, were to reveal that the statement to Captain Cottam and the urinalysis were inadmissible.

One further comment is necessary. I agree completely with Senior Judge Kastl that an operational exigency exception is neither attractive nor reasonable. Like him, I believe that the Constitutional safeguards we have fought so hard to preserve are only meaningful if they are applied even when they pinch. Some sort of blanket reason for suspending Fourth and Fifth Amendment protections based only on the fact that the suspects are crew members on a warplane, even in peacetime, is sure to cut more deeply than is warranted.