United States, Appellee and Cross-Appellant

v.

Ray T. LEAK, Staff Sergeant
U.S. Army, Appellant and Cross-Appellee

Nos. 03-0647 and 04-5001

Crim. App. No. 20000356

United States Court of Appeals for the Armed Forces

Argued October 6, 2004

Decided July 21, 2005

BAKER, J., delivered the opinion of the Court, in which
CRAWFORD, EFFRON, and ERDMANN, JJ., joined.  GIERKE, C.J., filed
a separate opinion, concurring in part and dissenting in part.

Counsel

For Appellant and Cross-Appellee: Captain Rob W. McDonald
(argued); Colonel Robert D. Teetsel, Lieutenant Colonel Mark
Tellitocci, and Major Allyson G. Lambert (on brief).

For Appellee and Cross-Appellant: Captain Edward E. Wiggers
(argued); Colonel Lauren B. Leeker, Colonel Steven T. Salata,
Lieutenant Colonel Margaret B. Baines, Lieutenant Colonel Mark
L. Johnson, Major Natalie A. Kolb, and Captain Mark J. Hamel (on
brief).

Military Judge: Donna M. Wright

**THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION**.

Judge BAKER delivered the opinion of the Court.

Appellant and Cross-Appellee (Appellant) was tried by a general court-martial composed of officer members. Contrary to his pleas he was convicted of three specifications of maltreatment, rape, two specifications of adultery, indecent assault, indecent acts, and solicitation to commit adultery, in violation of Articles 93, 120 and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 893, 920, 934 (2000). The adjudged and approved sentence included a dishonorable discharge, confinement for sixty-one months, forfeiture of $200 pay per month for sixty months and reduction to the lowest enlisted grade, E-1.

## FACTUAL BACKGROUND

Appellant's offenses resulted from his conduct with Specialist (SPC) M on three separate dates. The facts relied on by the Court of Criminal Appeals follow:

> Specialist (SPC) M's testimony was the primary basis for appellant's conviction. The guilty findings related to three incidents of sexual activity between appellant and SPC M during her attendance as a student at the thirty-day Primary Leadership Development Course (PLDC) at the 7th Army Noncommissioned Officer (NCO) Academy in Grafenwoehr, Germany. At the time of her attendance, SPC M had been on active duty between four and five years. She was a single parent of a fifteen-month old son. Specialist M was 65 inches tall and weighed approximately 130 pounds, and appellant was 71 inches tall and weighed approximately 188 pounds. At the time of the offenses, appellant was a thirty-four-year-old Small Group Leader (SGL) at the NCO Academy. However, he was not a member of SPC

2

M's platoon; he was not her SGL or instructor.  He did not rate her.  On all three occasions, while appellant and SPC M were wearing battle dress uniforms, appellant initiated sexual activity with SPC M in the third floor SGL office during breaks between SPC M's classes.

### 10 September Offenses

Before 10 September 1999, appellant went out of his way to engage SPC M in personal conversations.  During this time period, SPC M complained to appellant that her roommate was spreading a rumor that she was fraternizing with another student.  Specialist M asked for appellant's help with her roommate.  Appellant responded that he could "get anyone kicked out" of PLDC, and SPC M assumed that appellant would have her roommate dismissed from the course.  However, her roommate was not dismissed from the course.

Appellant used two offices at the NCO Academy, one located on the first floor and one on the third floor.  The first time appellant asked SPC M to go to the third floor SGL office, she said "no."  Later when he asked her to go there, she agreed because she did not "feel like [she] had a choice."  Once in the third floor SGL office, appellant asked SPC M what her intentions were toward him.  She asked what he meant; appellant repeated the same question.  They went near a couch.  He put his arms around her, pulled her close, and kissed her.  She put her hands on his chest to "put space between [them]" and leaned back.  Appellant then said he wanted to have sex with her. He held SPC M's wrist and started "groping" her and tried to undo her pants and belt buckle.  Specialist M told him "no" and said, "I know you don't think you're going to get me that easily."  She "wrestled" with appellant, preventing him from removing her trousers.  This testimony was the basis for appellant's conviction of one specification each of maltreatment, indecent assault, and solicitation to commit adultery.

Appellant told SPC M that he wanted to masturbate before she left the room.  He got some toilet paper and she sat on the couch.  Appellant masturbated in front of her until he ejaculated.  He cleaned himself with toilet paper and she left the room.  She

3

testified that she did not cry out during the incident because she was nervous.  She was afraid to run for the door because she did not know what he would do.  She did not report appellant's behavior because she was afraid that he might lie about her, causing her dismissal from PLDC. Specialist M emphasized her responsibility to her infant son, stating, "I'm a single parent ... [and I] had to do what is best for both of us."  Appellant was not charged with any specific offense for masturbating in SPC M's presence.

After this first incident on 10 September 1999, SPC M "acted like nothing happened" and "blew it off."  She still smiled at appellant and was courteous to him.

### 12 September Offenses

Appellant asked SPC M to go to his third floor office two days later.  They each went to his office separately.  Specialist M went "because [she] thought [she] could talk [her way] out of it again."  Appellant locked the door and left the key in the lock, precluding others who shared the office from entering during the sexual activity.  He said he "wanted [her]," but SPC M laughed and said, "I don't have time for this."  He replied that she had twenty minutes between classes.  Appellant grabbed SPC M and wrestled with her, trying to get her trousers down.  She said "no" more than once.  Appellant held one of her wrists and tried to unbuckle her trousers with his other hand.

As this was occurring, SPC M decided, "'I'm not going to win this battle.'  I was not going to try to fight him, so I let him have sex with me."  She was surprised when appellant took a condom out of the desk.  She noticed he had a box and a bag containing condoms.  Specialist M accused appellant of "setting her up" and "bringing other females up there."  He denied that he was setting her up and asserted "that he never did anything like that before."  They engaged in sexual intercourse on the desk.  He ejaculated, removed the condom, and wrapped it in a tissue.  She pulled up her trousers, unlocked the door, and left.

4

Specialist M testified that she let appellant have sex with her because she was worried that appellant might dismiss her from PLDC for having a bad attitude given that she already had trouble with her roommate. Appellant was found guilty of one specification each of maltreatment, rape, and adultery for his conduct on 12 September 1999.

### 21 September Offenses

On the third occasion, appellant gave SPC M a key and asked her to meet him at the third floor SGL office after lunch. She asked him, "What happens if I get caught going up there?" Appellant responded, "I'll just tell them that I sent you up there for something." About an hour after receiving the key, SPC M went to the third floor office. She told appellant there was insufficient time for sexual activity, but he "begged" her to give him five minutes. She said "no" and they "wrestled as usual." He put on a condom and then had sexual intercourse with SPC M on the office couch. She was face down during the intercourse. Afterwards, appellant put the used condom into a tissue. Specialist M pulled up her trousers and ran back to class where others noted her ebullient demeanor and her efforts to make the students laugh.

Specialist M testified that she did not do anything else to let appellant know that she did not want to have sex with him. At one point, she asked him whether he was forcing himself on her, and he said "no." Later, the following exchange occurred between SPC M and trial defense counsel:

> Q. What was it that you were more scared of than having sex forced upon you again by the accused?
>
> SPC M. I was afraid of not graduating [from] the class and not being successful, and that's -- I mean this is all I have to take care of my son. The Army is all I have.

United States v. Leak, 58 M.J. 869, 870-72 (A. Ct. Crim. App. 2003).

Regarding the events of September 21, 1999, at trial Appellant was found not guilty of rape, but guilty of the lesser included offense of indecent acts, and guilty of one specification each of maltreatment and adultery.

## PROCEDURAL BACKGROUND

Concluding that it was "not convinced beyond a reasonable doubt that the sexual intercourse on September 12 was done by force and without SPC M's consent," id. at 877, the Army Court of Criminal Appeals found the evidence of rape factually insufficient and affirmed the lesser included offense of indecent assault. The court also set aside the finding of guilt on the indecent acts offense and instead affirmed a lesser included offense of a simple disorder in violation of Article 134, UCMJ. After reassessing the sentence, the lower court affirmed only so much of the sentence providing for a dishonorable discharge, confinement for three years, forfeiture of $200 pay per month for three years and reduction to the lowest enlisted grade, E-1. Appellant then petitioned this Court for review.

Subsequent to Appellant's filing of his petition, the Government filed a certificate for review asking whether the lower court applied the correct legal standard in reviewing and reversing Appellant's conviction for rape. While Appellant's petition and the Government's certificate were under

consideration, we specified two additional issues relating to our authority to review the certified question.  We subsequently specified a third issue related to the previous two specified questions.  The following issues are now before the Court:[1]

### THE GRANTED ISSUE

WHETHER THE ARMY COURT OF CRIMINAL APPEALS ERRED BY CONVICTING APPELLANT OF THE GREATER OFFENSE OF MALTREATMENT AND ITS LESSER INCLUDED OFFENSE OF A VIOLATION OF A SIMPLE DISORDER BASED ON THE SAME ACTS?

### THE CERTIFIED QUESTION

WHETHER THE UNITED STATES ARMY COURT OF CRIMINAL APPEALS ERRED WHEN IT EMPLOYED A "REASONABLE FEAR OF DEATH OR GRIEVOUS BODILY INJURY" STANDARD ON THE ISSUE OF CONSTRUCTIVE FORCE IN CONTRAVENTION OF THIS COURT'S HOLDING IN UNITED STATES V. SIMPSON, 58 M.J. 368 (C.A.A.F. 2003).

### FIRST SPECIFIED ISSUE

WHETHER THIS COURT HAS JURISDICTION TO ACT WITH RESPECT TO A FINDING SET ASIDE BY A COURT OF CRIMINAL APPEALS AS FACTUALLY INSUFFICIENT?

### SECOND SPECIFIED ISSUE

WHETHER A COURT OF CRIMINAL APPEALS' FINDING OF FACTUAL INSUFFICIENCY PRECLUDES REINSTATEMENT OF THE AFFECTED FINDING OF GUILTY ON DOUBLE JEOPARDY GROUNDS?

### THIRD SPECIFIED ISSUE

WHETHER ARTICLE 67(C), UCMJ, WHICH PROVIDES THAT THIS COURT "MAY ACT ONLY WITH RESPECT TO THE FINDINGS AND SENTENCE . . . AS AFFIRMED OR SET ASIDE AS INCORRECT IN LAW BY THE COURT OF CRIMINAL APPEALS":  (1) ALLOWS THIS COURT TO ANSWER A CERTIFIED ISSUE CONCERNING A REVIEW OF LEGAL STANDARDS EMPLOYED BY THE COURT OF CRIMINAL APPEALS IN SETTING ASIDE A SPECIFICATION AS

---

[1] We heard oral argument in this case at Vermont Law School, South Royalton, Vermont, as part of the Court's "Project Outreach."  See United States v. Mahoney, 58 M.J. 346, 347 n.1 (C.A.A.F. 2003).

FACTUALLY INSUFFICIENT; AND (2) ALLOWS A CERTIFIED ISSUE TO RESULT IN A REMAND TO THE COURT OF CRIMINAL APPEALS TO REEVALUATE A SPECIFICATION SET ASIDE AS FACTUALLY INSUFFICIENT.

## Discussion

### I

### THE SPECIFIED ISSUES

We begin by addressing the specified issues, which together test our authority to review and decide the certified question.

A.  Questions of Fact and Law and Article 67, UCMJ

Article 67, UCMJ, statutorily defines this Court's jurisdiction.  The relevant text states:

(a) The Court of Appeals for the Armed Forces shall review the record in --

. . .

   (2)  all cases reviewed by a Court of Criminal Appeals which the Judge Advocate General orders sent to the Court of Appeals for the Armed Forces for review;

. . .

(c) In any case reviewed by it, the Court of Appeals for the Armed Forces may act only with respect to the findings and sentence as approved by the convening authority and as affirmed or set aside as incorrect in law by the Court of Criminal Appeals.  In a case which the Judge Advocate General orders sent to the Court of Appeals for the Armed Forces, that action need be taken only with respect to the issues raised by him.  In a case reviewed upon petition of the accused, that action need be taken only with respect to issues specified in the grant of review.  The Court of Appeals for the Armed Forces shall take action only with respect to matters of law.

United States v. Leak, Nos. 03-0647/AR and 04-5001/AR

Article 67(a)(2),(c), UCMJ, 10 U.S.C. § 867(a)(2), (c) (emphasis added).

Two propositions relevant to the specified issues are textually plain. First, subsection (a) requires this Court to "review" the record in this case. Second, as stated in the last sentence of subsection (c), this Court's review is limited to questions of law.

The Judge Advocate General's certified question asks us to determine whether the lower court applied the correct law in reversing Appellant's conviction for rape on the ground of factual insufficiency. In this legal context, two jurisdictional questions arise. First, where the Court of Criminal Appeals has set aside a finding on the ground of factual insufficiency, may this Court nonetheless review that decision and address matters of law? Second, and related, does the language underscored in subsection (c) delimit, or curtail, the exercise of this Court's jurisdiction over a question of law certified by the Judge Advocate General?

One possible reading of the language in subsection (c) of the statute is that because the lower court did not affirm the finding with respect to Appellant's rape charge, or set it aside as incorrect in law, this Court is without authority to "act." Under this reading, this Court would be obliged to "review" the

9

Judge Advocate General's certified question, but we would have no statutory authority to "act."[2]

However, at the same time the statute states that "[t]he Court . . . <u>shall</u> take action only with respect to matters of law."  Article 67(c), UCMJ, 10 U.S.C. § 867(c) (emphasis added).  As the earlier language can be read narrowly to preclude this Court's exercise of jurisdiction in cases where courts of criminal appeals do not affirm or set aside the findings as incorrect in law, this later language might be read narrowly to <u>require</u> this Court to take action in all certified cases with respect to matters of law.  Further, because the statute does not define the terms "act" or "review," the language of the statute is ambiguous as to what is intended by a structure that would have this Court review all certified cases, but not act on certain of those cases.

Given this ambiguity we believe it axiomatic that Article 67 must be interpreted in light of the overall jurisdictional concept intended by the Congress, and not through the selective

---

[2] Neither the statutory language nor the legislative history of Article 67 define the term "act."  However, we are mindful that Congress has chosen distinct terms to describe this Court's mandatory "review" of cases certified by the Judge Advocates General and the limitation in subsection (c) with respect to this Court "acting" upon cases that the courts of criminal appeals have not affirmed or set aside as incorrect in law.  Read in a manner to give both sentences their plain meaning, we believe the better view is that subsection (c) precludes this Court from taking final action on a case by either affirming or reversing the findings in a case that does not meet the criteria of subsection (c), but it does not preclude this Court from reviewing a certified question of law.

narrow reading of individual sentences within the article.

Having determined the necessity of reviewing the statutory

purpose, we turn now to the history on which these judgments are

based.  We will then consider this Court's longstanding

precedent in applying Article 67 in light of the statutory

purpose.

During the congressional drafting process of the UCMJ in

1949, both houses issued committee reports accompanying and

explaining their respective versions of the new Code.  With

respect to Article 67, each report contained the following

identical language:

> The Court of Military Appeals takes action only with
> respect to matters of law . . . . It may act only with
> respect to the findings and sentence as approved by
> the convening authority.  If the Board of Review has
> set aside a finding as against the weight of the
> evidence this decision cannot be reconsidered by the
> court.  If, on the other hand, the Board has set a
> case aside because of the improper introduction of
> evidence or because of other prejudicial error, the
> Court of Military Appeals may reverse if it finds
> there has been no such error.

H.R Rep. No. 81-491, at 32 (1949)(emphasis added); S. Rep. No.

81-486, at 29 (1949)(emphasis added) (both reports collected in

Index and Legislative History, Uniform Code of Military Justice

(1950)).  This expression of the committees' understanding of

Article 67 suggests that with respect to findings of factual

insufficiency, as long as a Judge Advocate General's certified

question raises a legal issue other than a complaint as to the

United States v. Leak, Nos. 03-0647/AR and 04-5001/AR

manner in which the lower court weighed the evidence, this Court shall review that claim.  Further, the legislative history indicates that Congress contemplated that this Court and not the lower courts would decide whether a claim presents a question of law or fact, and that with respect to questions of law, this Court would determine whether the lower court engaged in an erroneous application of the law.  Thus, in testimony before the House Armed Services Committee, the principal drafter of the UCMJ, Professor Edmund M. Morgan Jr., stated, "They [the Judicial Council[3]] review questions of law only . . . . We limit the civilian court to the review of questions of law."  Hearings on H.R. 2498 Before a Subcommittee of the House Committee on Armed Services, 81st Cong. 609 (1949) (statement of Prof. Edmund M. Morgan Jr., Chairman of UCMJ drafting committee), reprinted in Index and Legislative History, Uniform Code of Military Justice (1950) (not separately paginated).  When asked who would determine the initial question whether what was at issue was indeed a question of law, he explained:

> Why the judicial council would.  That is, the court of
> last resort would determine whether it was a question
> of law or a question of fact . . . . . Under our
> system, they would not pass on the weight of the
> evidence in the sense that they would set aside a
> finding because they thought it was against the weight
> of the evidence.

Id.

---

[3] The term "Judicial Council" was the name originally applied to what later became known as the Court of Military Appeals.

12

If the conclusion is that the lower court has erroneously applied the law, its decision on the finding is not yet final. Under these circumstances, the lower court's action can best be described as a setting aside of the finding "because of other prejudicial error," necessitating a remand to the lower court for application of proper legal principles. Once the lower court has complied and again reached a finding of factual insufficiency, there can be no further review of that finding. This scheme of review is not a "reconsideration" of the court's decision that the finding is against the weight of the evidence. And it is consistent with the precedent of this Court dating to the inception of the UCMJ.

In United States v. Thompson, 2 C.M.A. 460 (1953), a Navy board of review[4] had dismissed a finding of guilty to missing movement by neglect. According to the board of review, there was no proof of a causal connection between the accused's neglect in absenting himself and the missing of the scheduled movement. The relevant question certified by the Judge Advocate General was whether there was sufficient evidence, as a matter of law, to establish a prima-facie case of missing movement through neglect. In other words, the issue was whether the Government was required to prove as one of the elements of the offense that the scheduled movement was the proximate cause of

the accused's unauthorized absence.  Notwithstanding the wording

of the certified question, the Court suggested that the board's

opinion was unclear as to whether it had reached a conclusion of

factual insufficiency or legal insufficiency.  The Court began

its analysis by noting:

> [As] we read the opinion of the board of review, it
> amounts to a factual determination that there is
> insufficient evidence to support the findings.  If
> this determination is based solely on an appraisal of
> the evidence, we shall not overturn it.  Our
> jurisdiction is limited to questions of law and we
> shall, therefore, review the decision of the board of
> review only in so far as it purports to delineate the
> legal elements of the offense under consideration.

Id. at 462 (citations omitted).  This language unambiguously

indicates that the Court was expressly acknowledging its lack of

authority to review a factual insufficiency determination that

was based solely on the weight of the evidence.  Alternatively,

if that determination was reached after an erroneous

consideration of the elements of the offense, this Court saw

itself as statutorily obligated to review the matter.  After

concluding that the board of review had erred by requiring an

additional legal element not required by law, this Court

---

[4] This is the predecessor of the modern Navy-Marine Corps Court of Criminal
Appeals (formerly known as the Navy-Marine Court of Military Review).

remanded the case to the board for reconsideration in light of the legal principles announced in the case. In doing so, it issued a further clarification of the authority it had exercised by stating, "We should make it abundantly clear that if the board of review here determined that, conflict as to the issue of causal connection aside, there was insufficient evidence to support the findings, we are not reversing that determination." Id. at 464.

In United States v. Bunting, 6 C.M.A. 170 (1955), the Court further interpreted Article 67 in the context of a certified question submitted after a factual determination by a board of review disposing of the findings. In that case, the board concluded "as a matter of fact" that they had a reasonable doubt as to the accused's sanity at the time of the offenses and dismissed the findings. The Judge Advocate General certified a question asking whether the board had erred as a matter of law "in its analysis of the testimony" in dismissing the findings. Id. at 172. After again recognizing its authority over matters of law exclusively, the Court made the following observation:

> It is implicit in the grant of authority found in
> Article 67 of the Code that a board of review may not
> permissibly defeat review in this Court by labeling a
> matter of law, or a mixed holding of law and fact, as
> a question of fact. To avoid that impasse, we look to
> the substance of the holding, and its rationale, not
> to the characterization by the board of review.

Id. at 173.  The Court went on to conclude that the issue as to the accused's sanity was "one of fact, not law" and held that the board had not erred.  Neither Thompson nor Bunting have been overruled by this Court, or abrogated by subsequent legislation or executive directive.[5]

These precedents along with the legislative history convince us that it is within this Court's authority to review a lower court's determination of factual insufficiency for application of correct legal principles.  At the same time, this authority is limited to matters of law; we may not reassess a lower court's fact-finding.[6]  A contrary reading would defeat the overall intent of Article 67 -- to grant this Court jurisdiction to decide matters of law raised by appellants or certified by Judge Advocates General.  Moreover, such a reading would divest Article 67(a)(2) of its obvious and plain meaning,

---

[5] Solely for the purpose of establishing that Bunting remains good law, we note that it was cited by this Court as recently as 1998 for the proposition that the "board of review may not exercise its factfinding power in a manner contrary to what 'all reasonable men' would conclude." United States v. Townsend, 49 M.J. 175, 180 n.11 (C.A.A.F. 1998) (citing Bunting, 6 C.M.A. at 175).

[6] To the extent our judgment today is perceived as encouraging the Government to certify questions of law in cases where courts of criminal appeals have ruled against the Government on the ground of factual insufficiency, we note that this door has been open since the inception of the UCMJ and expressly so since Thompson was decided in 1953.  The Judge Advocates General have not used their certification authority in such a manner.  Were they to do so, this Court would be obliged to review all such cases, but consistent with Article 67, could not act with respect to cases it found presented questions of fact and not law.  Where the issue raised was clearly one of fact, and not law, nothing in Article 67 would preclude this Court from reviewing a case in a succinct manner.

United States v. Leak, Nos. 03-0647/AR and 04-5001/AR

except in those cases where the Court of Criminal Appeals has affirmed a finding and sentence or decided the case on the grounds of legal insufficiency.  This view would also make dispositive the terminology used by the lower courts in conducting their reviews, under Article 66, UCMJ, 10 U.S.C. § 866 (2000), thereby putting beyond reach matters of law in those cases purportedly decided on the grounds of factual insufficiency.  "Although a Court of Criminal Appeals has broad fact-finding power, its application of the law to the facts must [still] be based on a correct view of the law."  United States v. Weatherspoon, 49 M.J. 209, 212 (C.A.A.F. 1998).

For these reasons, we conclude Article 67 does not preclude review of questions of law certified by Judge Advocates General where the courts of criminal appeals have set aside a finding on the ground of factual insufficiency.  However, such review must be conducted in a manner consistent with the Double Jeopardy Clause.

B.  Double Jeopardy

The specified issues also raise the question of whether double jeopardy considerations preclude a remand in the event we answer the certified question in the affirmative.  Rephrased, is a service court's determination that the evidence is factually insufficient on a finding considered an "acquittal" for the purposes of the Double Jeopardy Clause?

17

United States v. Leak, Nos. 03-0647/AR and 04-5001/AR

The Double Jeopardy Clause of the Constitution states "nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb."  U.S. Const. amend. V.  As is clear from the text of the clause and common-law origins, the prohibition is directed at the threat of multiple prosecutions. United States v. Wilson, 420 U.S. 332, 342 (1975).  The Supreme Court has noted that:

> The constitutional prohibition against "double jeopardy" was designed to protect an individual from being subjected to the hazards of trial and possible conviction more than once for an alleged offense . . . . The underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

Green v. United States, 355 U.S. 184, 187-88 (1957). "'[C]entral to the objective of the prohibition against successive trials' is the barrier to 'affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding.'"  United States v. DiFrancesco, 449 U.S. 117, 128 (1980)(citation omitted).  Thus, the clause "protects against a second prosecution for the same offense after acquittal.  It protects against a second prosecution for the same offense after conviction.  And it protects against

18

multiple punishments for the same offense." North Carolina v. Pearce, 395 U.S. 711, 717 (1969) overruled on other grounds by Alabama v. Smith, 490 U.S. 794 (1989). The first two protections are relevant to the issues before us.

An acquittal has been afforded special consideration in the law of double jeopardy. Thus, a "verdict of acquittal . . . could not be reviewed, on error or otherwise, without putting [a defendant] twice in jeopardy, and thereby violating the Constitution." United States v. Ball, 163 U.S. 662, 671 (1896). "If the innocence of the accused has been confirmed by a final judgment, the Constitution conclusively presumes that a second trial would be unfair." Arizona v. Washington, 434 U.S. 497, 503 (1978).

However, civilian jurisprudence distinguishes between appellate review in the wake of a verdict of guilty and appellate review following a jury or bench trial acquittal. In Wilson, the jury returned a guilty verdict against the defendant for a federal offense. 420 U.S. at 353. The trial court dismissed the indictment with prejudice on the ground that the delay between the offense and the indictment had prejudiced the defendant's right to a fair trial. The Government appealed the ruling dismissing the indictment to the U.S. Court of Appeals for the Third Circuit. That court held that the Double Jeopardy Clause barred review of the trial court's ruling. The Supreme

Court granted certiorari to consider the applicability of the Double Jeopardy Clause to Government appeals from post-verdict rulings by the trial court. In the Court's view, a decision on appeal in favor of the Government simply reinstates the guilty verdict of the jury. Therefore, the Court held that permitting the Government to appeal would not expose the defendant to a second trial for the same offense. Id. "Where there is no threat of either multiple punishment or successive prosecutions, the Double Jeopardy Clause is not offended."[7] Id. at 344.

In United States v. Martin Linen Supply Co., 430 U.S. 564 (1977), a deadlocked jury was unable to agree upon a verdict at the defendant corporations' contempt trial. The district court granted motions for judgments of acquittal under Fed. R. Crim. P. 29 and the Government appealed. The court of appeals held that because reversal of the acquittals would enable the Government to try the defendants a second time, the Double Jeopardy Clause barred the appeals. Affirming the lower court, the Supreme Court reasoned that the trial court had acted where the jury had not. It then went on to hold that the Double

---

[7] Although Wilson was not a case involving Fed. R. Crim. P. 29, the point is no less illustrative. Fed. R. Crim. P. 29, allows a district court judge to grant a motion for judgment of acquittal at any one of three points in the trial: before submitting the case to the jury, if the jury returns undecided, or after the jury has returned a verdict of guilty. The Government may appeal such rulings under 18 U.S.C § 3731 except "where the Double Jeopardy Clause of the United States Constitution prohibits further prosecution."

Jeopardy Clause bars appeal from an acquittal entered under Fed. R. Crim. P. 29 after a jury mistrial.  Id. at 574.

More recently, in United States v. Genova, 333 F.3d 750 (7th Cir. 2003)(and cases cited therein), the court of appeals applied the rationales of both Wilson and Martin Linen Supply Co.  In Genova, the jury returned guilty verdicts on two counts of misapplication and diversion of funds in violation of federal law.  The district court subsequently granted motions for acquittal under Fed. R. Crim. P. 29 and the Government appealed. In reinstating the convictions, the Seventh Circuit said, among other things, that "the Double Jeopardy Clause does not bar a Government appeal from a ruling in favor of the defendant after a guilty verdict has been entered by the trier of fact."  Id. at 756 (quoting DiFrancesco, 449 U.S. at 130).

Several principles emerge.  First, the Double Jeopardy Clause bars successive trials.  Second, the clause does not bar an appeal by the Government following a judge's entry of a judgment of acquittal when the jury has previously returned a verdict of guilty.  However, an acquittal returned by a jury, or by a judge in a bench trial sitting as the trier of fact, is final.

In light of the distinct de novo factual powers of the service courts of criminal appeals, this precedent does not create an immediate template for the military context.  As a

United States v. Leak, Nos. 03-0647/AR and 04-5001/AR

result, this case poses the question whether in the military justice system the decision to set aside a guilty verdict on factual insufficiency grounds by a service court of criminal appeals is equivalent to an acquittal at trial for the purposes of the Double Jeopardy Clause.  This Court's decisions in United States v. Crider, 22 C.M.A. 108 (1973)[hereinafter Crider II], and United States v. Riley, 55 M.J. 185 (C.A.A.F. 2001), offer some support for both sides of the argument.

In Crider II, the accused was convicted of four specifications of premeditated murder.  22 C.M.A. at 108-09. The Court of Military Review approved as correct in law and fact the lesser included offense of unpremeditated murder.  This Court granted the appellant's petition for review and reversed the lower court's decision holding that the members of the reviewing panel should have recused themselves.  United States v. Crider, 21 C.M.A. 193 (1972).  On further review, a different panel of the Court of Military Review affirmed the original findings of guilt to premeditated murder.  Appellant again appealed.  Although both sides claimed that double jeopardy principles turned the decision in their favor, the Court ruled for Appellant on the ground that in military law "an accused cannot come to harm by appealing here and securing reversal of his conviction."  Crider II, 22 C.M.A. at 110.  However, in reaching this conclusion, the Court stated, "[i]f the Government

22

believes that the Court of Military Review erred, it has the right to seek certification of the case by the Judge Advocate General for possible corrective action in this Court." Id. On the one hand, this statement left open the possibility that had the Government certified a claim of legal error regarding the affected offenses and prevailed, the Court of Military Review could have revisited, from a legal standpoint, its earlier "acquittal." On the other hand, the Court described the fact-finding function of the courts of criminal appeals as analogous to the actions of a trial fact-finder.

> Essentially, the Court of Military Review provides a de novo trial on the record at appellate level, with full authority to disbelieve the witnesses, [and] determine issues of fact . . . . We believe such a court's exercise of its fact-finding powers in determining the degree of guilt to be found on the record is more apposite to the action of a trial court than to that of an appellate body.

Id. at 111.

In Riley, the appellant was convicted of the unpremeditated murder of her newborn child. 55 M.J. at 186. The Court of Criminal Appeals set aside the conviction of unpremeditated murder on the ground that the evidence was factually insufficient and affirmed a lesser included offense of involuntary manslaughter. This Court reversed, holding that the lower court had affirmed the lesser included offense on a theory not presented to the trier of fact. On remand, the Government

23

argued in the court below that the court was now free to revisit its earlier determination of factual insufficiency on the offense of unpremeditated murder.  The lower court disagreed and the Government certified the question whether that court had erred in not revisiting its decision on the unpremeditated murder offense.  Concluding that the rationale of Crider II was controlling, this Court held that reinstatement of the conviction of unpremeditated murder was prohibited.  Riley, 55 M.J. at 188.  This reinforced the holdings in Crider II that an accused should incur no harm by appealing and that absent a certified question on the affected offenses, an accused is entitled to plead double jeopardy against any attempt by the Court of Criminal Appeals to reinstate and affirm the conviction of a greater offense.  22 C.M.A at 111.  We then answered the certified question in the negative.

Considering the principles behind the Double Jeopardy Clause and precedent, in our view a lower court's finding of factual insufficiency is not the legal equivalent of an acquittal by the trier of fact at the court-martial level.  For sure, Congress "intended to give an accused a de novo proceeding on the merits and to empower the Courts of Criminal Appeals to acquit an accused."  Riley, 55 M.J. at 188.  We have also stated "that Congress intended a Court of Criminal Appeals to act as factfinder in an appellate-review capacity and not in the first

24

instance as a trial court."  United States v. Ginn, 47 M.J. 236, 242 (C.A.A.F. 1997).  A court of criminal appeals is more akin to a district court entering its judgment of acquittal pursuant to Fed. R. Crim. P. 29 than it is to a trial jury.  In such a case, "[u]nder the double jeopardy clause the government may appeal the granting of a motion for judgment of acquittal only if there would be no necessity for another trial, i.e., only where the jury has returned a verdict of guilty."  Fed. R. Crim. P. 29 advisory committee's note (discussing Dec. 1, 1994, amendments).  In the military justice system, at the time a court of criminal appeals makes a determination of factual insufficiency, a guilty finding will necessarily have been returned by a court-martial.  Indeed, we have distinguished this de novo review power from a trial in recognizing that the courts of criminal appeals must exercise their unique fact-finding powers making allowances for not having personally observed the witnesses who testified at the trial.  United States v. Walters, 58 M.J. 391, 395 (C.A.A.F. 2003); United States v. Turner, 25 M.J. 324, 325 (C.M.A. 1987).

But that is not to say the principles behind the Double Jeopardy Clause do not apply.  "'[C]entral to the objective of the prohibition against successive trials' is the barrier to 'affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding.'"

25

DiFrancesco, 449 U.S. at 128 (citation omitted).  Exercise of this Court's authority under Article 67 to review certified questions of law does not permit supplementation of the factual record by either side.  The lower court's review having become final with the assumption of this Court's jurisdiction, the facts, as opposed to the application of the law to those facts, are set.  Nor, may this Court supplant the lower court's evaluation of the weight of the evidence with our own.  In such a case, we would indeed be acting beyond our statutory authority.  This, too, is consistent with the overall jurisdictional scheme contemplated by Congress.  The power of de novo factual review that the courts of criminal appeals possess was intended as a safeguard to servicemembers.  United States v. Parker, 36 M.J. 269, 271 (C.M.A. 1993)(declaring that plenary de novo power of review is to protect an accused); United States v. Claxton, 32 M.J. 159, 162 (C.M.A. 1991)(describing review under Article 66(c) as "carte blanche to do justice").

For the reasons stated above, we hold that neither Article 67(c) nor double jeopardy considerations preclude this Court from reviewing the question of law raised by the Government by certification where the members at trial have returned a verdict of guilty.

II

THE CERTIFIED QUESTION

A.  Applicable Law

In military law, rape is "an act of sexual intercourse, by force and without consent."  Article 120, UCMJ.  The Manual for Courts-Martial lists the elements of rape as:

(1) That the accused committed an act of sexual intercourse; and

(2) That the act of sexual intercourse was done by force and without consent.

Manual for Courts-Martial, United States, (2002 ed.) (MCM), pt. IV, ¶ 45.b.

Although listed within the same element, the discussion and case law make clear that force and lack of consent are distinct, although related, elements of the offense.  United States v. Simpson, 58 M.J. 368, 377 (C.A.A.F. 2003)("[F]orce and lack of consent are separate elements . . . .").  Whether the elements of the offense are met is based on a totality of the circumstances.  United States v. Cauley, 45 M.J. 353, 356 (C.A.A.F. 1996).

In plain English, consent generally means voluntary agreement.  See, e.g., Merriam-Webster's Collegiate Dictionary 265 (11th ed. 2003).  In discussing rape and carnal knowledge, the MCM amplifies this definition, pointing out that:

The lack of consent required, however, is more than mere lack of acquiescence.  If a victim in possession of his or

27

> her mental faculties fails to make lack of consent
> reasonably manifest by taking such measures of resistance
> as are called for by the circumstances, the inference may
> be drawn that the victim did consent.

MCM, pt. IV, ¶ 45.c. (1)(b). Significantly, "such measures of resistance" can be verbal, physical or a combination of the two. In other words, in context, a verbal "no" can manifest the necessary lack of consent for the offense of rape. In such a context, physical resistance is not required. Cauley, 45 M.J. at 356 ("[A] finding of lack of consent does not require proof that the witness physically resisted her attacker."). Moreover, proof of resistance in any form is not a necessary element of the offense of rape. United States v. Bonano-Torres, 31 M.J. 175, 179 (C.M.A 1990). It may, however, be probative on the issue of consent. Further, verbal or physical measures of resistance are not required "if resistance would have been futile, where resistance is overcome by threats of death or great bodily harm, or where the victim is unable to resist because of lack of mental or physical faculties." MCM, pt. IV, ¶ 45.c. (1)(b). In such a circumstance, there is no consent.

Force is the second essential element of rape. The MCM and case law recognize that force can be accomplished in one of two manners: actual force or constructive force. Actual force is physical force used to overcome a victim's lack of consent. United States v. Palmer, 33 M.J. 7, 9 (C.M.A. 1991). Actual

28

force requires "more than the incidental force involved in penetration." Bonano-Torres, 31 M.J. at 179.  However, military law also recognizes the concept of constructive force, which "may consist of expressed or implied threats of bodily harm." United States v. Hicks, 24 M.J. 3, 6 (C.M.A. 1987). "Constructive force may be shown by proof of a coercive atmosphere that includes, for example, threats to injure others or statements that resistance would be futile."  Simpson, 58 M.J. at 377.

In application, the concepts of actual and constructive force are complex for three reasons.  First, Article 120 is antiquated in its approach to sexual offenses.  In particular, the article does not reflect the more recent trend for rape statutes to recognize gradations in the offense based on context.  See generally Report of the Commission on the 50th Anniversary of the Uniform Code of Military Justice 11 (Nat'l Inst. of Military Justice 2001).  These statutes incorporate the legal realization that the force used may vary depending on the relationship and familiarity, if any, between perpetrator and victim, but the essence of the offense remains the same -- sexual intercourse against the will of the victim.  Because Article 120 is dated, its elements may not easily fit the range of circumstances now generally recognized as "rape," including date rape, acquaintance rape, statutory rape, as well as

stranger-on-stranger rape.  As a result, the traditional military rape elements have been applied in contexts for which the elements were not initially contemplated.  Case law has evolved to address this reality.  See, e.g., United States v. Simpson, 58 M.J. at 368 (drill instructor's coercive influence over recruits); United States v. Palmer, 33 M.J. at 7 (parental compulsion found to be a form of constructive force); United States v. Henderson, 4 C.M.A. 268 (1954)(concept of constructive force recognized as applicable to military).

Second, application of the concepts of actual and constructive force is complex because the elements of consent and force are often intertwined.  For example, these elements are included within the same statutory element, suggesting an intentional substantive link.  They also are often closely allied with regard to proof.  The same evidence offered on the issue of force, may also serve to prove lack of consent.  In this manner for example, evidence of measure(s) of resistance might prove both the elements of force and lack of consent.

Finally, these concepts are complex because actual and constructive force address bodily harm, but retain subtle but distinct differences in the standard of measurement required to demonstrate each.  This is succinctly and clearly stated in

Simpson:

> Fear of great bodily harm is used in the MCM with respect
> to inferring consent on the element of lack of consent.
> With respect to the use of constructive force to prove the
> element of force, however, we have held that it is
> sufficient if the Government proves that the abuse of
> authority placed the victim in fear of physical injury.

58 M.J. at 378-79 (citations omitted).  Moreover, in assessing
the totality of the circumstances, a court may well address both
the actual and constructive force concepts, and then apply the
same factual evidence to both, thus weaving facts with legal
standards.

    B.   The Law Applied in this Case

With this backdrop, we turn now to the lower court's
treatment of force and consent.  The Government argues that the
court applied the wrong legal standard to its factual review of
the evidence.  In particular, the Government argues that the
court applied the more rigorous "grievous bodily harm" measure
in finding an absence of constructive force, when Simpson states
that the standard for constructive force is "physical injury."
As evidence of this error, the Government focuses almost
exclusively on the substance of the following sentence from the
lower court opinion, highlighted here within its parent
paragraph:

> On September 12, SPC M again initially resisted appellant's
> sexual advances.  She wrestled with him and told him "no."
> Appellant was unable to undo her trousers and belt.
> Appellant never threatened bodily harm to SPC M, nor did he

> expressly threaten her military career.  <u>Specialist M did not have a reasonable fear of death or grievous bodily injury, nor did she have a reasonable basis for her conclusion that resistance would be futile</u>.  When she saw multiple condoms in his office, she was not too intimidated to challenge his intentions toward other women.  As such, we find that SPC M ceased to resist and then engaged in sexual intercourse with appellant.  We may infer consent with respect to a rape charge unless SPC M made her lack of consent reasonably manifest by taking such measures of resistance as are called for by the circumstances.

<u>Leak</u>, 58 M.J. at 876 (citations, footnotes, and internal quotation marks omitted) (emphasis added).

Responding, Appellant argues that this Court does not have jurisdiction to answer this question, but that in any event, the lower court has applied the correct standard to its legal review.  Therefore, under either argument the lower court's decision to set aside Appellant's conviction for rape is final.

We conclude the Court of Criminal Appeals has included within its opinion the essential elements of rape, and has correctly disaggregated the concepts of actual and constructive force.  It also applied the correct legal measure to both concepts.  The language cited by the Government is addressed to the element of consent and not the element of force.

To start, the sentence appears within a paragraph discussing consent and not the element of force.  Moreover, breaking the sentence down into its constituent parts, it is evident that the first and second clauses of the sentence are

intended to address the second and first clauses of the MCM's

text concerning inferred consent, which states:

> Consent, however, may not be inferred if resistance would
> have been futile, where resistance is overcome by threats
> of death or great bodily harm, or where the victim is
> unable to resist because of the lack of mental or physical
> faculties.  In such a case there is no consent and the
> force involved in penetration will suffice.

MCM, pt. IV, ¶ 45.c. (1)(b)(emphasis added).

Thus, the lower court did not confuse the requisite

standard of physical apprehension addressed to the element of

consent with the lesser apprehension of physical injury

necessary to demonstrate constructive force.

However, we are less certain of the lower court's

application of the law to the facts with respect to this

statement:

> we find that SPC M ceased to resist and then engaged in
> sexual intercourse with appellant.  We may infer consent
> with respect to a rape charge unless SPC M made her lack of
> consent reasonably manifest by taking such measures of
> resistance as are called for by the circumstances.

Leak, 58 M.J. at 876 (citations and internal quotation marks

omitted).

On the one hand, this language might be read as the

sequential evaluation of resistance as a measure of lack of

consent.  The court, having found in the preceding sentences

that resistance would not have been futile, and that resistance

was not overcome with the threat of death or great bodily harm,

had already found by implication that SPC M had not made her lack of consent reasonably manifest.

On the other hand, the court does not expressly find that the putative victim did not make her lack of consent reasonably manifest, before addressing the question of inferred consent. The court found "SPC M's testimony to be credible with respect to her unrebutted descriptions of her initial physical and oral manifestations of resistance and the eventual occurrence of sexual activity with appellant." Id. at 875-76. The Court of Criminal Appeals also found that SPC M "wrestled with him and told him 'no.' Appellant was unable to undo her trousers and belt." Id. at 876. In this factual context, the court's "ceased to resist" statement could suggest that the Court of Criminal Appeals considered SPC M's failure to continually resist, to present, in effect, a legal talisman as to whether or not she had consented. However, as stated earlier, as a matter of law depending on the circumstances, a victim need not physically resist to manifest lack of consent and once lack of consent has been reasonably manifested, one need not continually manifest that lack of consent through resistance. In some contexts, a verbal statement of lack of consent will establish the necessary manifested lack of consent -- "No," for example. In other cases, where the lack of consent is not manifest by the language used, or any language at all, or perhaps where the

34

language is superseded or accompanied by competing manifestations of consent, continual resistance may prove dispositive on the question of consent.  In this case, the lower court also found as fact that "[w]hen [SPC M] saw multiple condoms in his office, she was not too intimidated to challenge his intentions toward other women."  Id.  However, this sentence follows the earlier unequivocal analysis regarding inferred consent.  Without further discussion it is not clear, on the element of consent (as opposed to force) whether and how this fact may have modified the lower court's conclusion on consent.

Because this text is susceptible to two interpretations, one correct in law and the other not, we conclude that a remand for clarification is necessary.  We are conscious that few appellate opinions can survive the degree of line diagramming asked by the Government, and now by this Court.  At the same time, we are not prepared to read between the lines of the lower court's opinion and infer application of a correct standard of law given the importance of this matter of law to this case, and to the law generally.  Nor do we have authority to find any facts necessary to reach such a conclusion ourselves.  However, on remand for clarification the factual findings made by the Court of Criminal Appeals during its Article 66 review are final and may not be reevaluated.  See generally Riley, 55 M.J. at 185.

III

THE GRANTED ISSUE

Regarding the events of September 21, the Court of Criminal Appeals found that the intercourse that occurred on that date "was not open and notorious and thus it was not 'indecent.'" Leak, 58 M.J. at 878. Accordingly, the court determined the evidence was legally insufficient to sustain a conviction for indecent acts. Instead, the court affirmed the lesser offense of a simple disorder under Article 134 for "sexual activity of [a noncommissioned officer] cadre with an enlisted soldier in training." Id. However, Appellant already stood convicted of maltreatment under Article 93 for "engaging in sexual acts" with "a person subject to his orders." A simple disorder in this context is a lesser included offense of the maltreatment offense. "Offenses are multiplicious if one is a lesser-included offense of the other." United States v. Palagar, 56 M.J. 294, 296 (C.A.A.F. 2002).

Specifically, the accused was convicted of maltreating SPC M under Article 93 "by engaging in sexual acts with her." The "certain act"[8] under Article 134 found by the lower court as constituting the disorder was "sexual activity" with SPC M.

---

[8] Under the MCM, if conduct violating Article 134 "is punished as a disorder or neglect to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces, "one of the elements to be proved is "[t]hat the accused did or failed to do certain acts." MCM, pt. IV, ¶ 60.a. (1).

36

United States v. Leak, Nos. 03-0647/AR and 04-5001/AR

Leak, 58 M.J. at 878. Since "every enumerated offense under the UCMJ is per se prejudicial to good order and discipline," the elements of the disorder affirmed under Article 134 are wholly contained in the maltreatment offense as it was charged. United States v. Fuller, 54 M.J. 107, 112 (C.A.A.F. 2000)(sexual relations with subordinate found as lesser included offense of maltreatment). Thus, Appellant stands convicted of a greater and lesser offense based on the same conduct. Id. Consequently, the disorder affirmed under Article 134 must be dismissed.

## DECISION

The granted issue is answered in the affirmative. The conviction for a simple disorder affirmed by the Court of Criminal Appeals is dismissed. The certified question and the second specified issue are answered in the negative. Finally, the first and third specified issues are answered in the affirmative. The decision of the United States Army Court of Criminal Appeals is set aside. The record of trial is returned to the Judge Advocate General of the Army with instructions to the court to clarify its decision in accordance with the principles set forth in this opinion.

37

GIERKE, Chief Judge (concurring in part and dissenting in part):

The Government asks us to reinstate a finding of guilty that the lower court reversed as factually insufficient.  In my view, the correct answer to this request is the same as the punch line of the old joke about the Maine farmer asked for directions to Millinocket:  You can't get there from here.  Accordingly, I respectfully dissent from the majority opinion's resolution of the first and third specified issues.  Because I believe we have no authority to act on a finding that a Court of Criminal Appeals has set aside as factually insufficient, I would not reach the certified issue or the second specified issue.  I concur with the majority's resolution of the granted issue.

## I.  Article 67(c)

This is a Court of limited jurisdiction.  As the Supreme Court emphasized in Clinton v. Goldsmith, "CAAF's independent statutory jurisdiction is narrowly circumscribed."[1]  We are an Article I court.[2]  "Article I courts are courts of special jurisdiction created by Congress that cannot be given the plenary powers of Article III courts.  The authority of the

---

[1] 526 U.S. 529, 535 (1999).
[2] Article 141, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 941 (2000) ("There is a court of record known as the United States Court of Appeals for the Armed Forces.  The court is established under article I of the Constitution.").

Article I court is not only circumscribed by the [C]onstitution, but limited as well by the powers given to it by Congress."[3] Unless Congress has given us the authority to act, we may not do so.

Congress established our jurisdiction and powers in Article 67 of the Uniform Code of Military Justice (UCMJ).[4] Article 67(c) provides, "In any case reviewed by it, the Court of Appeals for the Armed Forces may act only with respect to the findings and sentence as approved by the convening authority and as affirmed or set aside as incorrect in law by the Court of Criminal Appeals."[5] This language conveys a clear and plain meaning: in a case where a Court of Criminal Appeals sets aside a finding on factual insufficiency grounds, rather than on legal grounds, we have no power to "act" on that finding. Such a ruling of the Court of Criminal Appeals is final.

That plain language meaning is so clear that the Army Government Appellate Division has recognized it in its brief to this Court. In its response to the third specified issue, the Government acknowledges that "[c]onsideration of the granted issue" falls "outside the specific terms of Article 67." That acknowledgement -- which reflects a correct reading of Article

---

[3] In re United Mo. Bank of Kansas City, N.A., 901 F.2d 1449, 1451-52 (8th Cir. 1990) (internal citation omitted).
[4] 10 U.S.C. § 867 (2000).
[5] Id. (emphasis added).

67 -- is dispositive of this case, because as an Article I court we have no power to act outside the specific terms of Article 67.[6]

As the Supreme Court has observed, "It is well established that when the statute's language is plain, the sole function of the courts -- at least where the disposition required by the text is not absurd -- is to enforce it according to its terms."[7]

---

[6] The Government attempts to escape from the inevitable consequences of its acknowledgement by asking this Court to exercise "general supervisory power over the administration of military justice," citing United States v. Jackson, 5 M.J. 223, 225 (C.M.A. 1978). The reasoning of the Solicitor General's brief for the United States in Clinton v. Goldsmith effectively refuted any notion that this Court has general supervisory authority beyond the scope of Article 67:

> "[S]upervisory authority" is not a basis for jurisdiction, but instead is a basis for a superior court to announce rules governing inferior courts, in the course of deciding cases that are within the superior court's jurisdiction. As this Court has explained, a court's "supervisory authority" permits the superior court in some circumstances to "formulate procedural rules not specifically required by the Constitution or the Congress [. . .] to implement a remedy for violation of recognized rights, [. . .] to preserve judicial integrity [. . .], and [. . .] to deter illegal conduct." United States v. Hasting, 461 U.S. 499, 505 (1983).

Reply Brief for Petitioners, Clinton v. Goldsmith, 526 U.S. 529 (1999). The Supreme Court's decision in Goldsmith echoed this view by observing that "the CAAF is not given authority, by the All Writs Act or otherwise, to oversee all matters arguably related to military justice, or to act as a plenary administrator even of criminal judgments it has affirmed." 526 U.S. at 536.

[7] Lamie v. United States Trustee, 540 U.S. 526, 534 (2004) (citations and internal quotation marks omitted).

So the plain meaning of the Article 67(c) -- that we are without power to act on a finding that a Court of Criminal Appeals has set aside as factually insufficient -- should prevail.

The majority opinion acknowledges this as a possible interpretation of Article 67(c),[8] yet declines to adopt it. The majority offers two bases for rejecting what I view as the plain-meaning interpretation. First, the majority contends that Article 67(c)'s provision that this Court "shall take action only with respect to matters of law" "might be read narrowly to require this Court to take action in all certified cases with respect to matters of law."[9] But that language appears to be a limitation on our power to act, not an express command that we take certain action. Acting with respect to a matter of fact would violate that provision; failing to act on a matter of law would not.

The majority also argues that because Article 67 "does not define the terms 'act' or 'review,' the language of the statute is ambiguous as to what is intended by a structure that would have this Court review all certified cases, but not act on certain of those cases."[10]

I see no ambiguity. Congress clearly intended our Article 67(c) power to act on a case to be narrower than our Article

---

[8] United States v. Leak, 61 M.J. __ (9-10).
[9] Id. at __ (10).
[10] Id.

4

67(a) responsibility to <u>review</u> certain cases.  Article 67(a) provides that this Court "shall <u>review</u> the record in . . . (2) all cases reviewed by a Court of Criminal Appeals which the Judge Advocate General orders sent to the Court of Appeals for the Armed Forces to review."[11]  Article 67(c) provides that "[i]n any case <u>reviewed</u> by it, the Court of Appeals for the Armed Forces may <u>act</u> only with respect to the findings and sentence . . . as affirmed or set aside as incorrect in law by the Court of Criminal Appeals."[12]  Congress established the authority to <u>act</u> as a subset of the authority to <u>review</u>.  This Court must <u>review</u> the record when a Judge Advocate General certifies an issue, but the result of that review may be to say that we have no statutory authority to <u>act</u>.  Such an interpretation is consistent with the majority's own analysis of the terms "review" and "act."[13]

Additionally, the majority's own construction of Article 67(c) would not avoid this perceived ambiguity.  For example, hypothesize that a Court of Criminal Appeals set aside a finding of guilty as factually insufficient and that the relevant Judge Advocate General then certified to this Court an issue expressly asking whether the evidence was factually sufficient.  Under the plain meaning of Article 67(c), we would be required to "review"

---

[11] 10 U.S.C. § 867(a) (2000) (emphasis added).
[12] 10 U.S.C. § 867(c) (2000) (emphasis added).
[13] <u>See</u> <u>Leak</u>, 61 M.J. at __ (10 n.2).

the record in that case.  But the majority would agree that we would have no power to "act" in that case.[14]  So under either the majority's interpretation or my interpretation, Article 67(c) requires this Court to "review all certified cases, but not act on certain of those cases."[15]  The only question that divides us is which cases fall within the latter prohibition.  I believe that the plain language of Article 67(c) answers that question: we may not "act" with respect to the portion of a finding that a Court of Criminal Appeals has set aside as factually insufficient.

Because the statute's meaning is plain, we need not -- and should not -- go beyond the statute's text to interpret it.  As Judge Easterbrook has written for the Seventh Circuit, "legislative history . . . may be used only when there is a genuine ambiguity in the statute."[16]  But if it were proper to consult the UCMJ's legislative history, such consultation would support the conclusion that Congress did not intend to allow this Court to act on a finding that a Court of Criminal Appeals has set aside as factually insufficient.

This meaning is reflected by the House and Senate Armed Services Committees' reports on the draft UCMJ.  Those reports

---

[14] See id. at __ (15, 16 n.6).
[15] Id. at __ (10).
[16] Board of Trade of the City of Chicago v. S.E.C., 187 F.3d 713, 720 (7th Cir. 1999).

are particularly significant because, as the Supreme Court has noted, a "committee report represents the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation."[17]  Both reports observed, "If the Board of Review has set aside a finding as against the weight of the evidence this decision cannot be reconsidered by the [C]ourt [of Military Appeals]."[18]  The reports contrast such a ruling with one in which a board of review "has set a case aside because of the improper introduction of evidence or because of other prejudicial error."[19]  Thus, the Armed Services Committees' analysis of Article 67(c) emphasized the basis on which the board of review ruled.  If that basis was factual insufficiency, then the board of review's ruling was final.  If, on the other hand, the basis was some form of legal error, then the issue could be certified to this Court for further review.  In this case, the basis of the Army Court's ruling was factual insufficiency.  So under both the plain language of the statute and the Armed Services Committees' analysis of the statute, that ruling is final.  We have no power to revive the portion of the finding that the Army Court set aside as factually insufficient.

---

[17] Zuber v. Allen, 396 U.S. 168, 186 (1969).
[18] H. Rep. No. 81-491, at 32 (1949); S. Rep. No. 81-486, at 29 (1949).
[19] Id.

7

The majority, however, finds an "ambiguity in statutory intent" and posits that it is "axiomatic that Article 67 must be interpreted in light of the overall jurisdictional concept intended by the Congress, and not through the selective narrow reading of individual sentences within the article."[20]  But concluding that Congress precluded this Court from reviving a finding that a Court of Criminal Appeals set aside as factually insufficient is not a "narrow reading" of Article 67(c); it is the plain meaning of Article 67(c).  In any event, courts are supposed to read Article I courts' jurisdictional statutes narrowly.  The majority's conceptual approach appears to violate the general principle of statutory construction that "jurisdiction of courts is neither granted nor assumed by implication."[21]  That maxim is particularly apt in the case of an Article I court, whose jurisdiction "must be strictly construed."[22]

The majority emphasizes that this Court retains the authority to determine whether a decision of a Court of Criminal Appeals is a legal or factual ruling.[23]  I agree.  But as the majority itself acknowledges, "the Army Court of Criminal

---

[20] Leak, 61 M.J. __ at (10-11).
[21] 3A Norman J. Singer, Statutes and Statutory Construction § 67.3 (6th ed. 2003).
[22] Northrop Grumman Corp. v. United States, 47 Fed. Cl. 20, 40 (2000) (quoting Mega Construction Co. v. United States, 24 Fed. Cl. 396, 472 (1993)).
[23] Leak, 61 M.J. at __ (12).

Appeals found the evidence of rape factually insufficient and affirmed the lesser included offense of indecent assault."[24] So this is not a case where a Court of Criminal Appeals ruled on a legal matter but attempted to insulate its ruling from further review by pretending that it had, instead, ruled on a factual matter. The majority has exercised this Court's authority to distinguish legal from factual rulings by concluding that the lower court's decision was based on factual insufficiency. This conclusion places this case outside our Article 67(c) authority to act.

In discussing the legislative history that indicates this Court retains the discretion to decide whether the lower court's ruling was a factual or legal decision, the majority states that if we conclude "that the lower court has erroneously applied the law," then the lower court's "decision on the finding is not yet final."[25] This puts the cart before the horse. Under the majority's interpretation, we must determine the merits of the case before making what I view as the threshold decision of whether we have the power to act on the case. In this case, we <u>still</u> do not know whether the lower court erroneously applied the law because this Court concludes that the Army Court's opinion is "susceptible to two interpretations, one correct in

---

[24] <u>Id.</u> at __ (6).
[25] <u>Id.</u> at __ (13).

law and the other not."[26]  Additionally, the majority's approach

appears to allow the certification of almost all cases that

result in a finding of factual insufficiency, because such

decisions will almost invariably discuss the law and apply the

law to the facts of the case.  Under the majority's approach,

this Court would be required to analyze any such discussion or

application of the law for legal correctness.  The plain meaning

interpretation of Article 67(c) is far easier to apply, because

it merely calls for a determination of the basis of the lower

court's ruling rather than a far more searching analysis of

whether any legal errors contributed to the ultimate ruling.

The majority ably demonstrates that its interpretation of

Article 67(c) finds support in this Court's early precedent.[27]

But because this precedent's approach conflicts with Article

67(c)'s plain meaning, I would give effect to the congressional

limitation on our power.  Additionally that half-century old

precedent[28] was decided without the benefit of the Supreme

---

[26] Id. at __ (35).

[27] Id. at __ (13-16).

[28] The majority also cites the more recent case of United States
v. Weatherspoon, 49 M.J. 209 (C.A.A.F. 1998).  See Leak, 61 M.J.
at __ (17).  But in Weatherspoon, the Air Force Court of
Criminal Appeals had affirmed the findings.  See 49 M.J. at 210.
So Weatherspoon says nothing about whether this Court may act on
a finding that the Court of Criminal Appeals set aside as
factually insufficient.

10

Court's recent emphasis on the limitations of this Court's jurisdiction.[29]

The majority concludes its analysis of this issue by holding that "Article 67 does not preclude review of questions of law certified by Judge Advocates General where the courts of criminal appeals have set aside a finding on the ground of factual insufficiency."[30]  That holding is absolutely correct. This Court does have power to <u>review</u> such issues.  As an Article I court, we are not bound by any Article III prohibition against "answer[ing] certified questions which would not or did not alter the position of the parties."[31]  We have, on occasion, issued such opinions.[32]  What this Court lacks is any statutory authority to <u>act</u> in such instances.

So this Court is free to address whether the Army Court employed a correct or incorrect constructive force standard. This Court is free to provide analysis of this question that will guide the lower court -- and other military justice practitioners -- in future cases.  But Congress has not authorized us to <u>act</u> on a case like this.  Accordingly, the majority exceeds its authority when it returns the case for the

---

[29] See <u>Goldsmith</u>, 526 U.S. 529.
[30] <u>Leak</u>, 61 M.J. __ at __ (17).
[31] <u>United States v. Russett</u>, 40 M.J. 184, 185 (C.A.A.F. 1994).
[32] <u>See generally</u> <u>id.</u> at 185-86 (citing <u>United States v. Martin</u>, 20 M.J. 227 (C.M.A. 1985); <u>United States v. Wheaton</u>, 18 M.J. 159 (C.M.A. 1984); <u>United States v. Kuehl</u>, 11 M.J. 126 (C.M.A. 1981)).

Army Court to clarify its holding regarding Charge II, Specification 1 -- a finding on which this Court has no authority to "act."

## II.  Double Jeopardy

Nor do I join in the portion of the majority opinion addressing the double jeopardy implications of reviving Charge II, Specification 1.  Under the doctrine of constitutional avoidance, when "'a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter.'"[33]  In this case, construing Article 67(c) to deprive this Court of authority to revive Charge II, Specification 1 would avoid having to address the double jeopardy issue.  Because we can -- and should -- adopt that construction, I would not reach the double jeopardy question.

---

[33] Harris v. United States, 536 U.S. 545, 555 (2002) (quoting United States ex rel. Attorney General v. Delaware & Hudson Co., 213 U.S. 366, 408 (1909)).